1               IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF INDIANA
2                      SOUTH BEND DIVISION

3    UNITED STATES OF AMERICA        )   Cause No.:
                                     )   3:20-cr-00006-JD
4              vs.                    )
                                     )
5    RAPHEAL SEAY,                    )   South Bend, Indiana
                                     )   July 22, 2020
6              Defendant.            )
                                     )
7    _____ )

8


9
                TRANSCRIPT OF EVIDENTIARY HEARING
10           BEFORE THE HONORABLE JON E. DEGUILIO

11

12   APPEARANCES:

13
     For the Government:        MS. MOLLY E. DONNELLY
14                              United States Attorney's Office
                                M01 Federal Building
15                              204 South Main Street
                                South Bend, IN  46601
16

17   For the Defendant:         MR. DAVID P. JONES
                                Newby Lewis Kaminski Jones LLP
18                              916 Lincolnway
                                LaPorte, IN  46350
19

20

21

22

23

24

25

1

2      WITNESSES:                                                    PAGE

3      KYLE SHIPARSKI

          DIRECT EXAMINATION BY MS. DONNELLY                    7
4          CROSS-EXAMINATION BY MR. JONES                       21
           REDIRECT EXAMINATION BY MS. DONNELLY                 31
5
       MATTHEW BABCOCK
6          DIRECT EXAMINATION BY MS. DONNELLY                   34
           CROSS-EXAMINATION BY MR. JONES                       43
7                                                               54

       WILLIE HENDERSON
8          DIRECT EXAMINATION BY MS. DONNELLY                   54
           CROSS-EXAMINATION BY MR. JONES                       62
9                                                               73

       MICHAEL OBERLE
10         DIRECT EXAMINATION BY MS. DONNELLY                   73
           CROSS-EXAMINATION BY MR. JONES                       82
11

12     EXHIBITS:                                                    PAGE

13     Government's Exhibit 1                                        13
       Government's Exhibit 2                                        19
14     Government's Exhibit 3                                        20
       Government's Exhibit 4                                        40
15     Government's Exhibit 5                                        59
       Government's Exhibit 6                                        78

16

17                              *   *   *

18

19

20

21

22

23

24

25

1          THE COURT:  Please be seated.

2          This is the case of United States of America v. the

3     defendant Rapheal Seay, Case 3:20-cr-6.

4          Are you Mr. Seay?

5          THE DEFENDANT:  Yes, sir.

6          THE COURT:  Good morning.  How are you?

7          THE DEFENDANT:  Fine.

8          THE COURT:  Good.

9          Mr. Seay is in court with his attorney, Mr. David

10    Jones.

11          Good morning, Mr. Jones.

12          MR. JONES:  Good morning, Judge.

13          THE COURT:  How are you?

14          MR. JONES:  Good.  Thank you.

15          THE COURT:  The government is represented by Assistant

16    United States Attorney Ms. Molly Donnelly.

17          Good morning, Ms. Donnelly.  How are you?

18          MS. DONNELLY:  Very well, Your Honor.  Thank you.

19          THE COURT:  We're here today on the evidentiary

20    hearing on the motion to suppress filed by the defendant,

21    Mr. Seay.  The Court will receive evidence.  I understand the

22    government has four potential witnesses as well as a number of

23    exhibits.

24          I don't know if the parties wanted to say anything

25    before we begin the hearing, but it seemed to me, Mr. Jones,

1    that your motion is based on a fairly isolated issue, that

2    being whether or not Officer Babcock had probable cause to make

3    the stop.

4            MR. JONES:  Exactly, Your Honor.  That would be my

5    opening statement.  That will be my argument at the end, that

6    while I appreciate the government setting the stage and the

7    maps and I think they will be very helpful, the question really

8    becomes is the Collective Knowledge Doctrine --

9            THE COURT:  Right.

10           MR. JONES:  -- and the three prongs, and that's going

11   to be the heart of my questions when the officers take the

12   stand about those issues.  Some officers won't have anything to

13   add with that, some will have a lot to add, but we'll see how

14   it goes.

15           THE COURT:  Right.  The parties can be seated

16   throughout the course of the hearing.  I prefer that if you are

17   going to speak, especially if you're going to speak with a mask

18   on, then it's more helpful to be seated; you're closer to the

19   microphone.  As you all know, you may remove your masks while

20   you're speaking.  I prefer you keep them on if you're not

21   speaking.

22           So you don't really question the events subsequent to

23   the stop, the nature of the search, the dog sniff, any of that;

24   it really comes down to whether or not Officer Babcock had

25   probable cause to make the stop.  If he did, everything that

 1   came from that doesn't seem problematic.

 2          MR. JONES:  Correct.  That's right.

 3          THE COURT:  Okay.  And to the extent that helps you,

 4   Ms. Donnelly, in terms of crafting the presentation of

 5   evidence, that's one of the reasons why I point that out.

 6          MS. DONNELLY:  Appreciate it, Your Honor.  I will

 7   likely get into some of those areas so the Court has the record

 8   but will curtail it as much as possible.

 9          THE COURT:  Okay.  Did counsel want to make any

10   statements before we begin evidence, Mr. Jones, or reserve

11   comment until later?

12          MR. JONES:  No, Your Honor.  My comments and the

13   Court's comments and the government's comments I think set the

14   stage for what we're going to hear and I'll have some comments

15   afterwards, but that's our position.

16          THE COURT:  Okay.  I assume we're operating under the

17   notion of a separation of witnesses.  I don't see any of them

18   here.

19          MS. DONNELLY:  That's correct, Your Honor.  They're in

20   the hall currently.

21          THE COURT:  All right.  Then I guess, with that, you

22   can call your first witness.

23          Just so you know, Quinton is here and he'll be

24   cleaning off the witness chair after every witness's testimony.

25   Just one more thing we're trying to do to maintain the safety

 1    of everyone involved.

 2           And, Quinton, thank you for being here.

 3           MS. DONNELLY:  Thank you, Your Honor.

 4           The government will first call Kyle Shiparski.

 5           (Witness enters courtroom.)

 6           THE COURT:  Detective, careful traversing to the

 7    witness stand.  We didn't make it very easy.

 8           Good morning.  How are you?

 9           THE WITNESS:  Good.

10           THE COURT:  If you would raise your right hand,

11    Mr. Schrader will recite the oath.

12           (Oath Administered to the Witness.)

13           THE WITNESS:  Yes.

14           THE COURT:  Thank you, sir.  Please have a seat.

15           Would you state your name and spell it for the record,

16    please.

17           THE WITNESS:  Kyle Shiparski, K-y-l-e

18    S-h-i-p-a-r-s-k-i.

19           THE COURT:  Thank you, Detective.

20           If you feel more comfortable, you may remove your mask

21    while testifying, but I would ask that you replace it after

22    you're done testifying.

23           THE WITNESS:  Okay.

24           THE COURT:  Ms. Donnelly, you're up.

25           MS. DONNELLY:  Thank you, Your Honor.

1                    **KYLE SHIPARSKI**,

2    having been duly sworn, was examined, and testified as follows:

3                       DIRECT EXAMINATION

4    BY MS. DONNELLY:

5    **Q.**   Corporal Shiparski, can you tell the Court where you work

6    and what your position is there.

7    **A.**   Yes.  I'm currently a detective at the Michigan City Police

8    Department assigned to the LaPorte County Drug Task Force.

9    **Q.**   How long have you been with the Michigan City Police

10   Department?

11   **A.**   Eight years.

12   **Q.**   Can you describe what the interaction is between the

13   Michigan City Police Department and the LaPorte County Drug

14   Task Force?

15   **A.**   Yes.  The LaPorte County Drug Task Force is a countywide,

16   federally funded initiative to combat drugs as well as drug-

17   related crimes within a kind of multi-jurisdictional unit.  I

18   specifically am assigned to the Michigan City Police Department

19   side of that as they are my employer, as also the Michigan City

20   Police Department is where the LaPorte County Drug Task Force

21   office is located.

22   **Q.**   Are there investigators from other nearby agencies other

23   than just Michigan City that are also members of the Drug Task

24   Force?

25   **A.**   Yes.  The LaPorte County Drug Task Force consists of

1   members from LaPorte County Sheriff, LaPorte City Police

2   Department, Michigan City Police Department, and the ATF.

3   **Q.**   How long have you worked as a narcotics investigator?

4   **A.**   Roughly four years.

5   **Q.**   And can you describe just briefly some of your training and

6   experience in that field.

7   **A.**   Yes.  So since becoming a detective with the LaPorte County

8   Drug Task Force, I've been involved with numerous drug-related

9   and firearm-related investigations.  My training started in

10  2012, upon being hired with the Michigan City Police

11  Department, where I completed the Indiana Law Enforcement

12  Academy.  And then, along the way, I have numerous other

13  trainings in more specialty fields, such as the analyzation of

14  historic cell phone records and have also received training in

15  street-level crime such as drug investigations and firearm

16  investigations.

17  **Q.**   Were you on duty on the afternoon of December 9th, 2019?

18  **A.**   Yes.

19  **Q.**   Around 4:00 p.m., were you conducting an investigation?

20  **A.**   Yes.

21  **Q.**   What were you investigating?

22  **A.**   On that date around 4:00, members of the LaPorte County

23  Drug Task Force began doing surveillance, specifically on a

24  subject known to us as Rapheal Seay.  Mr. Seay was known to us

25  at the time through previous -- or through an ongoing

1   investigation into the sale and distribution of narcotics.

2   Q.   And when you say "Rapheal Seay," do you see that individual

3   in court here today?

4   A.   Yes.

5   Q.   Can you please point to that individual and identify an

6   article of clothing that they are wearing.

7   A.   He's sitting right to your left and he's wearing a green

8   shirt (indicating).

9         MS. DONNELLY:   Your Honor, the government would ask

10   that the record reflect an in-court identification of the

11   defendant Rapheal Seay.

12         THE COURT:   Any objection, Mr. Jones?

13         MR. JONES:   No, Your Honor.

14         THE COURT:   The record will so reflect.

15   BY MS. DONNELLY:

16   Q.   Now, did you also have information and were you aware that

17   Mr. Seay was a convicted felon?

18   A.   Yes.

19   Q.   In terms of your investigation, what specifically were you

20   doing from 4:00 p.m. going forward?

21   A.   So starting -- as I say, starting at 4:00 p.m., we began

22   doing surveillance.  It would kind of be like in the central

23   part of town on the north side.  Myself and one of my partners,

24   Detective Jim Fish, were in plainclothes in an unmarked police

25   vehicle; and as we were watching a residence near Elm and Maple

 1   Street, we began observing traffic coming and going from that

 2   house, and, specifically, we observed a vehicle at the time

 3   that we knew to be associated to Mr. Seay.  And over the course

 4   of our surveillance, probably about 45 minutes to an hour, we

 5   observed that vehicle come and go from the residence a couple

 6   of times.

 7         We attempted to follow the vehicle a couple of times.

 8   However, after it would leave, we would either lose sight of it

 9   or we would take our spot back up and do our surveillance on

10   that same residence, and then the vehicle would return a short

11   time later.

12         At around, I believe it would be, probably about 4:30

13   or 4:45 p.m., we observed the vehicle return.  Two or three

14   subjects exited that vehicle, one of which characteristically

15   matched that of Mr. Seay.  After some time had passed, I

16   observed the subject who I recognized to be Mr. Seay approach a

17   vehicle that pulled up to the house in the front of the

18   residence.  He walked up to the driver side of the vehicle.

19   There was a very brief interaction with that vehicle.  And in

20   my training and experience, I recognized that to possibly be a

21   hand-to-hand transaction.

22         Shortly thereafter, Mr. Seay then entered back into

23   the driver's seat of that black sedan and he began traveling

24   south on Elm Street.

25   Q.   Now, when you say "hand-to-hand transaction," is that

1   associated with some type of narcotics?

2   **A.**   Yes.

3   **Q.**   And, approximately, if you can approximate, how many

4   investigations have you conducted in the past that involve

5   hand-to-hand transactions?

6   **A.**   Hundreds.

7   **Q.**   So this was a situation that you were familiar with seeing?

8   **A.**   Correct.

9   **Q.**   I want to go back just for a minute and ask a couple of

10  follow-up questions.

11          Now, you said that you and Detective Fish were in an

12  undercover car.  Does that type of undercover car have any

13  squad car video on it?

14  **A.**   No.

15  **Q.**   And you said you are in plainclothes.  So did you have any

16  body camera recording or anything like that?

17  **A.**   No.

18  **Q.**   When you're in an undercover car in plainclothes, is that a

19  car that has lights and sirens of any type?

20  **A.**   No.

21  **Q.**   While you were conducting surveillance from 4:00 p.m.

22  onwards, were you in contact with any other LaPorte County Drug

23  Task Force or Michigan City police personnel?

24  **A.**   Yes.  So at the beginning when we began conducting

25  surveillance initially, I contacted another member of the

```
 1    LaPorte County Drug Task Force, Corporal Henderson, and advised
 2    him of what we were doing.  He, at the time, was at the
 3    Michigan City Police Department conducting some follow-up on
 4    another investigation.  The area to where we were in relation
 5    to the department is only a couple blocks away, so he was
 6    maintaining radio communication with us on our encrypted
 7    frequency.
 8            As we began observing the traffic at that residence
 9    and in that area of town, I then called two Michigan City
10    Police Department officers who were on active duty at that
11    time, and that was Officer Babcock and Corporal Oberle.  I
12    contacted them by cell phone, and at the time I patched them
13    into a Bluetooth in-car phone system while also having
14    Detective Henderson on our encrypted radio.
15            I say that just because the two officers do not have
16    access to that frequency, so the only mode of communication
17    without calling it over the emergency line or whatnot would be
18    via phone.
19    Q.   And were you the passenger or driver in the undercover car?
20    A.   I was the passenger.
21    Q.   Now, I'm going to show you what's been marked as Exhibit 1.
22    Do you recognize that map?
23    A.   Yes.
24    Q.   What is it?
25    A.   This specifically encompasses a portion of town in Michigan
```

1   City, Indiana, near the police department.

2   Q.   And does that truly and accurately depict an overview of

3   the area that you've been discussing thus far?

4   A.   Yes.

5        MS. DONNELLY:  Your Honor, I'd seek to admit

6   Government's Exhibit 1.

7        THE COURT:  Any objection, Mr. Jones?

8        MR. JONES:  No, Your Honor.

9        THE COURT:  Government's Exhibit 1 is admitted without

10  objection.

11  BY MS. DONNELLY:

12  Q.   This portion of Michigan City, this is in the Northern

13  District of Indiana?

14  A.   Yes.

15  Q.   Now, can you point to the area you've been describing as

16  the house that you were surveilling?

17  A.   The specific home is right in this area here, right near

18  that intersection, kind of northeast corner (indicating).

19       MS. DONNELLY:  Your Honor, if the record could reflect

20  a circle drawn near the intersection of Elm and Main.

21       THE COURT:  The record will so reflect.

22  BY MS. DONNELLY:

23  Q.   As we can see on that map, that looks to be about two

24  blocks away from the Michigan City Police Department?

25  A.   Yes.

1  **Q.**  And that's where you said Corporal Henderson, when things

2  started, that's where he was located?

3  **A.**  Correct.

4  **Q.**  Now, was this area that you were surveilling, was it an

5  area that was known for any specific type of activity?

6  **A.**  Correct.  This area of town is one area in which we know to

7  kind of post or be an area that is associated with the sale and

8  distribution of narcotics.

9  **Q.**  Now, you mentioned that sometime around 4:30, 4:45 or so,

10  you saw Rapheal Seay participate in what you believed to be a

11  hand-to-hand narcotics transaction with an unknown or other

12  vehicle; is that right?

13  **A.**  Yes.

14  **Q.**  And then you said that he got into the driver's seat of a

15  car and began to drive away?

16  **A.**  Correct.

17  **Q.**  Was there anyone else that had gotten into that car or just

18  him?

19  **A.**  No.  I had previously seen two to three people exit that

20  vehicle.  At that time the vehicle was empty and the next

21  interaction with that vehicle was Mr. Seay getting into the

22  driver's seat.

23  **Q.**  As you were making these observations over the course of

24  about an hour, how often were you in touch with -- let's say,

25  first, how often were you in touch with Corporal Henderson

1  through the encrypted police radio?

2  **A.**   From the moment we began surveillance, I was in constant

3  communication with Corporal Henderson via the radio.

4  **Q.**   What about with then Officer/now Corporal Oberle and

5  Officer Babcock through the cell phone Bluetooth?

6  **A.**   I contacted them once we began observing kind of movement

7  and traffic at the house.  It's common for us to reach out to

8  officers to assist with a traffic stop when we are attempting

9  to do one.

10  **Q.**   Is that in part because you cannot yourself effectuate a

11  traffic stop?

12  **A.**   Correct, not in that situation.

13  **Q.**   Now, as the car began to drive away, which direction did it

14  travel?

15  **A.**   So if you look at the circle I drew, there's Elm Street

16  that travels north and south.  The vehicle left the area of

17  where my circle is there at Main Street and began traveling

18  south on Elm Street.

19  **Q.**   What did you observe then?

20  **A.**   At the time we were positioned -- I'll point it out on

21  here.  We were roughly positioned in this area, me and my

22  partner.  We observed the vehicle travel south on Elm, and

23  there are stop signs located at Pearl and located at Dupage

24  Street.  As the vehicle traveled south, I observed that vehicle

25  and the driver disregard both of those stop signs (indicating).

1    Q.   The stop signs at the intersection of Elm and Pearl as well

2    as Elm and Dupage?

3    A.   Yes.

4         MS. DONNELLY:  And, Your Honor, if the record could

5    reflect when the witness had indicated that he was marking the

6    map, it is on the east side of Elm Street between Pearl and

7    Dupage.

8         THE COURT:  The record will so reflect.

9    BY MS. DONNELLY:

10   Q.   Now, when you saw the car disregard those two stop signs,

11   what did you do?

12   A.   At the time, by that point, Corporal Henderson had gotten

13   into his unmarked vehicle and he was sitting up somewhere in

14   the same area.  I'm not exactly sure where he was.  So as this

15   occurred, I was communicating with him on the radio.  At that

16   same time, I had Officers Oberle and Babcock on the phone,

17   again, on that speaker Bluetooth system within our vehicle.

18        So as that's happening and as I'm communicating with

19   Corporal Henderson via radio, Babcock and Oberle can also hear

20   what I'm saying to Corporal Henderson.

21   Q.   And what did you inform all of those parties of?

22   A.   Yeah.  I informed everybody that the vehicle and driver had

23   disregarded those two stop signs that we discussed, and then I

24   was, again, requesting that the vehicle be -- have a traffic

25   stop done on that vehicle by Officer Babcock and/or Oberle.

SIMARSKI - DIRECT EXAMINATION

1    Q.   And did you then see if, in fact, one of those two officers
2    successfully pulled the car over?
3    A.   Yes.  As the vehicle continued south, it eventually turned
4    to the east, which I now know I believe was Thurman Avenue
5    there.  It was at that time that Officer Babcock conducted a
6    traffic stop on that vehicle.
7    Q.   And did you then see from a distance as that traffic stop
8    proceeded?
9    A.   Correct.  At that point, me and my partner, we relocated to
10   even further east of where the traffic stop was in case
11   something else were to happen, like someone were to run or
12   whatnot, which did not occur on this occasion.  So rather,
13   instead, we were roughly a half block away, and we observed the
14   traffic stop as it was being conducted.
15   Q.   And what ultimately happened to Mr. Seay, the driver of the
16   car?
17   A.   Mr. Seay was ultimately arrested for a dealing in marijuana
18   charge as well as for possession of a handgun.
19   Q.   Was he transported away from the scene?
20   A.   Yes.  He was transported to Michigan City Police
21   Department.
22   Q.   And after he had been transported from the scene, did you
23   and Detective Fish arrive on scene at the actual processing of
24   the car?
25   A.   Yes.

1  Q.   Now, later that evening around 7:00 p.m., did you see
2  Rapheal Seay in one of the interview rooms at the Michigan City
3  police station?
4  A.   Yes.  After he was transported to the Michigan City Police
5  Department, myself and Corporal Henderson conducted an
6  interview with Mr. Seay at the police department.
7  Q.   Before speaking with Mr. Seay, did you advise him of
8  certain things?
9  A.   Yes, I reviewed the LaPorte County Prosecuting Attorney's
10  Office constitutional rights waiver form.  Mr. Seay
11  acknowledged his rights, waived them, and agreed to speak with
12  us without a lawyer present.
13  Q.   I'm showing you next what's been marked as Government's
14  Exhibit 2.  Do you recognize that document?
15  A.   Yes.  That is the form I just mentioned.
16  Q.   And the portion where it describes your rights, there
17  appears to be initials to the right of "RS."  Who wrote those
18  initials?
19  A.   Rapheal Seay.
20  Q.   And at the bottom, there are two witness signatures as well
21  as a signature of Rapheal Seay.  Who signed the Rapheal Seay?
22  A.   Rapheal Seay, the one in the courtroom today.
23  Q.   And does this form -- I understand it's a copy, but does it
24  appear to be the same or substantially the same as when it was
25  filled out and reviewed with Mr. Seay on December 9th?

1    **A.**   Yes.

2          MS. DONNELLY:  Your Honor, I would seek to admit

3    Government's Exhibit 2.

4          THE COURT:  Any objection, Mr. Jones?

5          MR. JONES:  No, Your Honor.

6          THE COURT:  Government's Exhibit 2 is admitted without

7    objection.

8    BY MS. DONNELLY:

9    **Q.**   After you reviewed Mr. Seay's rights pursuant to *Miranda*

10   with him, did he agree to speak to you?

11   **A.**   Yes.

12   **Q.**   And during that interview, did he make inculpatory

13   statements about both the firearm recovered in the car as well

14   as marijuana recovered on him?

15   **A.**   Yes.

16   **Q.**   Now, was there also -- it was other officers, namely,

17   Corporal Henderson and Officer Oberle, who actually searched

18   the vehicle; is that correct?

19   **A.**   Correct.

20   **Q.**   But it's your understanding that in addition to a firearm

21   found in the car there was also a phone that was recovered as

22   evidence?

23   **A.**   Yes.

24   **Q.**   Now, that telephone, did you seek a search warrant for

25   that?

1    **A.**   Yes.

2    **Q.**   I'm showing you next what's been marked as Government

3    Exhibit 3.  This is a five-page document.  The first two are a

4    search warrant and then the final three are an affidavit.  That

5    last page, is that signed by you?

6    **A.**   Yes.

7    **Q.**   And what do you recognize this search warrant and affidavit

8    to be?

9    **A.**   That would be for the cellular phone that Mr. Seay had upon

10   his arrest.

11   **Q.**   And was this search warrant, in fact, signed by a LaPorte

12   County judge on January 2nd of 2020?

13   **A.**   Yes.

14   **Q.**   And is this Government's 3 -- again, I understand it's a

15   copy -- but does it appear to be the same or substantially the

16   same, both the search warrant and the affidavit, as when it was

17   completed by you and then signed by the judge?

18   **A.**   Yes.

19        MS. DONNELLY:  Your Honor, I would seek to admit

20   Government's Exhibit 3.

21        THE COURT:  Mr. Jones?

22        MR. JONES:  No objection.

23        THE COURT:  Government's Exhibit 3 is admitted without

24   objection.

25

1  BY MS. DONNELLY:

2  **Q.**  Was the cell phone then transported to the Indiana State

3  Police for evidence extraction?

4  **A.**  Yes.

5  **Q.**  And was it successfully extracted?

6  **A.**  I believe so.

7  **Q.**  And is it your understanding that there's certain evidence

8  linking Mr. Seay to firearms in the content of that phone?

9  **A.**  Correct.

10        MS. DONNELLY:  Your Honor, I have no further questions

11  for this witness.

12        THE COURT:  Thank you, Ms. Donnelly.

13        Cross, Mr. Jones.

14                    CROSS-EXAMINATION

15  BY MR. JONES:

16  **Q.**  Corporal Shiparski, did you have an opportunity to arrest

17  Mr. Seay prior to the traffic infraction?

18  **A.**  No.

19  **Q.**  Why not?

20  **A.**  What do you mean?  Can you restate the question, please?

21  **Q.**  In your report -- you wrote a report, correct?

22  **A.**  Yes.

23  **Q.**  And it's about two pages, more or less?

24  **A.**  Correct.

25  **Q.**  In your report, you said that you witnessed a hand-to-hand

1    drug transaction.  Through your training and experience, that's

2    what you thought it was, correct?

3    A.   Yes.

4    Q.   In a high drug trafficking area within Michigan City?

5    A.   Correct.

6    Q.   And just to back up, the Drug Task Force is targeting

7    Mr. Seay, correct?  He was a person of interest?

8    A.   He was a person of interest, yes.

9    Q.   And you witnessed a person of interest conduct a

10   hand-to-hand transaction?

11   A.   Correct.

12   Q.   Doesn't that present an opportunity for you to arrest the

13   defendant at that time?

14   A.   No.

15   Q.   Why not?

16   A.   At that point, again, that would be something that would

17   cause me to try to further an investigation.  Meaning, at that

18   time I don't have evidence that -- drug evidence that that was

19   actually conducted.  However, it does give me some information

20   as well as some kind of -- I guess information to seek out the

21   investigation as it was done in this circumstance.

22   Q.   Could you have rolled up and asked him questions and

23   conducted a search at that time?

24   A.   I guess I'm not sure how to answer that question.  I guess,

25   could I have approached him and talked to him?  Yes.  Is that

1  how I chose and sought after for this investigation?  No.

2  Q.   Okay.  Can you, for the Court, tell us approximately,

3  before Mr. Seay pulls away from that residence, where everybody

4  is located.  Where are you and Detective Fish located?

5  A.   As I pointed out in the first exhibit, I believe it was, we

6  were positioned right along Elm Street just about a

7  block-and-a-half, two blocks south of that residence on Main.

8  Q.   And then where was Oberle and Babcock located?

9  A.   They were parked on the west side lot of the Michigan City

10  Police Department.

11  Q.   And how do you know that?

12  A.   They advised that to me during the phone conversation.

13  Q.   Is that included in your report?

14  A.   No.

15  Q.   And you mentioned that Detective Henderson is physically

16  located within the Michigan City Police Department at that

17  time?

18  A.   Initially he was.  However, he subsequent -- at the time in

19  which Mr. Seay pulled up south and conducted those infractions,

20  he was in his unmarked vehicle parked somewhere in or around

21  the same area as we were.

22  Q.   When you initially saw the hand-to-hand, Detective

23  Henderson was at the Michigan City Police Department?

24  A.   I believe so.

25  Q.   And the time it takes -- what's the time frame -- from the

1  hand-to-hand until you testified that he disregarded the stop

2  sign, what's the time frame involved in that?

3  A.  I believe it was anywhere from -- I think it's, like,

4  15 minutes, 30 minutes at the most.

5  Q.  I mean, when Mr. Seay pulls away from the house that you

6  had circled until you say he committed a traffic infraction,

7  what's that time frame?

8  A.  Oh, seconds.

9  Q.  I thought that Detective Henderson, while the hand-to-hand

10  was going on, was at Michigan City PD?

11  A.  You would have to ask him that.  Again, I recall at the

12  time in which the hand-to-hand happened he was in his car, but

13  he could have been at the station.  You would have to ask him

14  that question.

15  Q.  Okay.  So you're in an unmarked vehicle and you're watching

16  a house that Mr. Seay pulled up in front of where this drug

17  transaction -- alleged drug transaction is going down, correct?

18  A.  Correct.

19  Q.  And I want to understand the communications.  You're on an

20  encrypted channel with Detective Henderson, correct?

21  A.  Yeah, by our department-issued radios.

22  Q.  That's a police radio that's encrypted?

23  A.  Correct.

24  Q.  It's not a cell phone; it's an encrypted radio

25  transmission?

1    A.   Right.  When I say "encrypted," the only thing I'm implying

2    is that the public cannot access that channel at all.

3    Q.   That's the way I understood it as well.  And I assume

4    anybody that has the credentials can be listening in?

5    A.   Correct.

6    Q.   And you told us that Babcock and Oberle don't have the

7    credentials to listen in?

8    A.   Correct.

9    Q.   So did you call the K-9, which is Oberle, and the arresting

10   Officer Babcock before the infraction occurred?

11   A.   Yes.

12   Q.   And what did you tell them, that this guy was going to

13   commit a traffic infraction, watch out?

14   A.   No, negative on that.  What I did say to them is I advised

15   them that we are doing surveillance in an area on a subject

16   known to us as Rapheal Seay and that we were conducting

17   surveillance and we might be seeking their help to conduct a

18   traffic stop.

19   Q.   So this was all put in play before the infraction took

20   place?

21   A.   Yes.

22   Q.   Now, your conversations with Babcock and Oberle are over a

23   cellular telephone?

24   A.   Correct.

25   Q.   And it's linked to Bluetooth so that other people can hear

1   it on the encrypted channel?

2   A.   So it would be -- so they were on the Bluetooth phone

3   system with me and Detective Fish.  The only time that I

4   broadcast over the radio is when I initiate that by hitting the

5   button on the side to talk through it.  However, my

6   conversations with Corporal Henderson at the time would be

7   heard by them since they're on speakerphone, more or less.

8   However, unless I'm holding the talk button to talk to Corporal

9   Henderson, he would not hear the communication that I'm having

10   with Oberle and Babcock.

11   Q.   And you have a department-issued cell phone that you're

12   using?

13   A.   Yes, as well as a personal phone.

14   Q.   Does your personal phone have anything to do with this case

15   at all?  Was it ever used?

16   A.   I can't recall what phone I used at that time.

17   Q.   So there's two possible cell phones that you could have

18   been using in this case during this stop?

19   A.   Correct.

20   Q.   You dial then, and who do you call, Babcock and then

21   conference Oberle in, or do you call Oberle and conference

22   Babcock in?

23   A.   One of those two ways, but I can't say exactly how it

24   happened.

25   Q.   Are you calling them on their personal cell phones or are

1   you calling them on their department-issued cell phones?

2   A.   Their personal cell phones.  I believe -- again, as a K-9

3   officer, I believe you get a department-issued cell phone.  As

4   an officer, you do not.  So I can't remember what numbers I

5   called for Officer Oberle at that time or Babcock.  For Officer

6   Babcock, it was certainly his personal phone.  And then with

7   Corporal Oberle or Officer Oberle, I can't remember which one I

8   chose.

9   Q.   Why do you say it had to have been a personal phone for

10  Officer Babcock?

11  A.   He's a patrolman and patrolmen are not issued department

12  cell phones.

13  Q.   So somewhere there would be cell phone records of at least

14  evidence of you making the calls and perhaps the duration of

15  the calls, correct?

16  A.   Potentially.

17  Q.   Has anyone ever gotten those records to match them up with

18  the police reports, your calls to them or their records that

19  might show this?

20  A.   No.

21  Q.   Did you ever put in your police report or your

22  investigation report that you're speaking with Detective

23  Henderson on it at all?

24  A.   I did not mention him by name specifically.  However, in

25  the beginning of my report, I kind of did an umbrella statement

1  stating that members of the LaPorte County Drug Task Force were

2  conducting surveillance.

3  **Q.**   I see that.  Is there any place in your police report that

4  indicates that you communicated with Detective Henderson

5  specifically about what you observed?

6  **A.**   Not specifically, no.

7  **Q.**   In other words, you used the words in a couple of places

8  that you were conducting surveillance on Mr. Seay, correct?

9  **A.**   Correct.

10  **Q.**   So if we would read your police report, there's nothing in

11  your police report that says, "I told Detective Henderson that

12  Mr. Seay committed a traffic infraction"?

13  **A.**   Correct, that is not in my report.

14  **Q.**   It is in your report -- your report says that you contacted

15  Officer Babcock and notified him of your observed traffic

16  infraction?

17  **A.**   Correct, and that is encompassing the conversation through

18  that Bluetooth speakerphone system.

19  **Q.**   How do we know that if it's not written down, that multiple

20  people might have heard that or participated in it?

21  **A.**   What is not written down?

22  **Q.**   That you're on a conference -- my words -- conference call,

23  speakerphone, and that information is transmitted to multiple

24  people versus what your report says, "I contacted Officer

25  Babcock"?

1    A.   The way I word --

2    Q.   How do we tell, is what my question is.

3    A.   The only way you can tell that, I guess, is by asking me

4    today.  In my report specifically, I try to be clear and a

5    little more concise and at the time of writing that report the

6    simple fact of me contacting Officer Babcock to advise him of

7    the infraction is exactly what occurred.

8    Q.   And what did you tell -- so who are you talking to then?

9    Who's your audience when you say that you observed an

10   infraction?

11   A.   At that time I had Officer Babcock/Corporal Oberle on the

12   Bluetooth speaker system on speaker so they can hear me

13   talking, just as I am to you, and it was also at that time that

14   I initiated to transmit on that radio frequency to relay the

15   same message to Corporal Henderson.  So in my audience at that

16   time there were all three of the other officers involved.

17   Q.   But there's only one that's going to conduct the stop,

18   correct?

19   A.   Correct.  It's only going to be one of two people.  It's

20   either going to be Corporal Oberle or Officer Babcock.

21   Q.   So they're the intended recipients of your information

22   because they're the ones that are going to conduct the traffic

23   stop?

24   A.   Correct.  But, also, for officer safety reasons, having

25   Corporal Henderson aware of where we were at and where this

1    infraction occurred, as well as where Mr. Seay is at the time,

2    is important as well.

3    Q.   What facts did you tell Officer Babcock about your observed

4    traffic stop infraction?

5    A.   Officer Babcock, again, along with Oberle and Corporal

6    Henderson, I advised that Mr. Seay had disregarded a stop sign

7    at Elm and Pearl and Elm and Dupage.

8    Q.   You use the word "disregarded" here in court today, but

9    your report says "failed to come to a complete stop."  Is there

10   a difference?

11   A.   No, sir.

12   Q.   Did the vehicle just maintain the same speed all the way

13   through going down Elm Street, or did the vehicle stop and they

14   roll the stop sign?

15   A.   The vehicle would slow down, however, it would not come to

16   a complete stop where the stop sign was erected and proceeded

17   through the intersection.

18   Q.   And that formed the basis, then, of your probable cause,

19   was this traffic infraction that you observed?

20   A.   Correct.

21   Q.   Did you have a conversation with your detective that was

22   driving the automobile in which you were riding about what you

23   observed?

24   A.   We observed it at that time.

25   Q.   Do you know why Detective Fish, who was in the vehicle and

1    you say also observed it, did not write a report?

2    A.    Again, at the time, my eye was initiating the report as it

3    related to he and I -- he and I were both in the same exact car

4    for the entire time, so that is probably why he did not

5    generate one.

6              MR. JONES:  We pass the withins.

7              THE COURT:  Thank you, Mr. Jones.

8              Redirect, Ms. Donnelly.

9              MS. DONNELLY:  A few, Your Honor.  Thank you.

10                         REDIRECT EXAMINATION

11   BY MS. DONNELLY:

12   Q.    In terms of how investigations are conducted, is it fair to

13   say certain circumstances call for different investigatory

14   techniques?

15   A.    Yes.

16   Q.    And there could be reasons related to, for instance,

17   officer safety why you would not approach a subject that you

18   suspected of just conducting a hand-to-hand transaction in a

19   high narcotics trafficking area to have a conversation with

20   him?

21   A.    Correct.

22   Q.    And can you explain what some of those officer safety

23   concerns would be?

24   A.    In this situation, mainly because, at the time, in the

25   immediate area it was only Detective Fish and I within that

```
 1   vehicle.  Other information that we had of Mr. Seay being
 2   associated with firearms.  Things of that nature.
 3   Q.  And, similarly, just to nail down a timing question, you
 4   said you observed the suspected hand-to-hand transaction, and
 5   it was some time, 15 or more minutes after that, that Mr. Seay
 6   actually got into the car and drove away?
 7   A.  Yes.
 8   Q.  And it was shortly after that car drove away that you saw
 9   the traffic violations?
10   A.  Yes.
11           MS. DONNELLY:  Nothing further, Your Honor.
12           THE COURT:  Thank you, Ms. Donnelly.
13           Mr. Jones, any further cross?
14           MR. JONES:  No, Your Honor.
15           THE COURT:  Detective, have a nice day.  You're done.
16           With that, Quinton is gone.
17           COURT SECURITY OFFICER:  Your Honor, he had a family
18   medical emergency.
19           THE COURT:  Quinton did?
20           COURT SECURITY OFFICER:  Yes.
21           THE COURT:  Is somebody else going to be able to
22   replace him?
23           COURT SECURITY OFFICER:  That I don't know.
24           THE COURT:  Jay, do you want to inquire?  I thought I
25   saw somebody else from the cleaning crew in there.
```

1                    (Discussion held off the record.)

2               THE COURT:  Mr. Jones, while we're waiting for the

3    cleaning, in your motion, you had submitted Exhibits A through

4    G.  Were you going to be moving for those to be admitted, or

5    were you assuming they would be admitted pursuant to your

6    motion?  I just wanted to clarify that.

7               MR. JONES:  My understanding would be for record

8    purposes they're part of the record because of filing them with

9    the Court.  And if there's appellate review, they're going to

10   be found in the record.  But I don't plan on admitting them

11   specifically in this hearing as an exhibit.

12              THE COURT:  Okay.  But they're --

13              MR. JONES:  They're exhibits to my motion.

14              THE COURT:  -- before the Court for purposes of your

15   motion?

16              MR. JONES:  Yes.

17              THE COURT:  You don't object to that, do you,

18   Ms. Donnelly?

19              MS. DONNELLY:  I don't, Your Honor.

20              THE COURT:  For the record.  Thank you.

21   We're good?

22              CLEANING STAFF:  Yes.

23              THE COURT:  Thank you, ma'am.

24              Your next witness, Ms. Donnelly.

25              MS. DONNELLY:  Next is Matthew Babcock, Your Honor.

BABCOCK - DIRECT EXAMINATION

```
 1              (Witness enters courtroom.)

 2              THE COURT:  We didn't make that pathway easy, did we?

 3     Sorry about that.

 4              Good morning, Officer Babcock.  How are you?

 5              THE WITNESS:  I'm good.

 6              THE COURT:  Good.  If you will raise your right hand,

 7     Mr. Schrader will recite the oath.

 8              (Oath Administered to the Witness.)

 9              THE WITNESS:  I do.

10              THE COURT:  Thank you.  Please have a seat.

11              You can remove your mask during your testimony if you

12     would like or you can leave it on and you can move that

13     microphone as well.  There you go.

14              Would you state your name and spell it for the record,

15     please.

16              THE WITNESS:  Matthew Babcock, M-a-t-t-h-e-w, last

17     name Babcock, B-a-b-c-o-c-k.

18              THE COURT:  Thank you, sir.

19              Ms. Donnelly.

20              MS. DONNELLY:  Thank you, Your Honor.

21                            MATTHEW BABCOCK,

22     having been duly sworn, was examined, and testified as follows:

23                            DIRECT EXAMINATION

24     BY MS. DONNELLY:

25     Q.  Can you please tell us where you work and what your
```

BABCOCK - DIRECT EXAMINATION

 1   position is.

 2   A.   I work for the Michigan City Police Department and I'm an

 3   officer assigned to the Uniform Patrol Division.

 4   Q.   How long have you been with the Michigan City Police

 5   Department?

 6   A.   About three years.

 7   Q.   And were you on duty on the afternoon of December 9th of

 8   2019?

 9   A.   Yes.

10   Q.   Were you on patrol on that day?

11   A.   Yes.

12   Q.   Were you in a marked or unmarked squad car?

13   A.   I was in a marked squad car.

14   Q.   Were you in full uniform like you have on today?

15   A.   I was in our Class C uniform which is a full uniform like

16   this, yes.

17   Q.   Did you also have a body camera device that you were

18   wearing that day?

19   A.   Yes.

20   Q.   Around 4:00 p.m., or shortly thereafter, did you begin

21   speaking to some of the investigators from the LaPorte County

22   Drug Task Force?

23   A.   Yes.

24   Q.   And how did that happen?

25   A.   Initially I was called by now Corporal but then Officer

```
 1    Oberle, and he informed me that LaPorte County Drug Task Force
 2    was doing surveillance and was possibly looking to stop a
 3    vehicle or make some kind of investigation from their
 4    surveillance and to meet him in the west side parking lot of
 5    our station and wait for them to relay more information to us.
 6  Q.   Was it your understanding that the west side parking lot at
 7    the Michigan City Police Department was fairly close to the
 8    location where the surveillance was happening?
 9  A.   Yes.  It was only a few blocks away.
10  Q.   Now, at some point in time, did you yourself hear from the
11    investigators?
12  A.   Yes.  After I met with Officer Oberle in the parking lot, I
13    then began a conference call with Officer Oberle, Detective
14    Shiparski, and myself.
15  Q.   Were you and Officer Oberle in separate squad cars?
16  A.   We were in separate vehicles, but we were parked next to
17    each other.
18  Q.   Now, from your conversations, I guess, so then Officer/now
19    Corporal Oberle had his phone in his car, you had your phone in
20    your car, and then the investigators had contacted you both?
21  A.   Correct.
22  Q.   Which investigators was that?
23  A.   Detective Shiparski was who initiated the call, but
24    Detectives Fish and Henderson were also involved.
25  Q.   Now, how long approximately were you in that parking lot
```

BABCOCK - DIRECT EXAMINATION

 1  receiving information?

 2  A.   It could have been around 20 to 30 minutes.

 3  Q.   And as you were getting information from, I guess,

 4  primarily Detective Shiparski, what did you learn?

 5  A.   We learned that they were doing surveillance of a

 6  particular house and that at one point a person that they were

 7  surveilling got into a vehicle and began to drive away and that

 8  they noticed several traffic infractions and wanted me to

 9  initiate a traffic stop of that vehicle.

10  Q.   Was there information that you had about what they had seen

11  the subject doing while they were surveilling him?

12  A.   Yes.  They mentioned that they noticed multiple

13  hand-to-hand transactions and that they suspected that there

14  was some drug dealing going on at that house.

15  Q.   Now, as you received the information about the traffic

16  violations, who are all of the voices, I guess, that you can

17  hear through your phone going on in this conversation?

18  A.   So through my phone I could hear Officer Oberle.  I could

19  also hear Detective Shiparski who was on the phone.  I believe

20  Detective Fish was in the vehicle with Detective Shiparski, so

21  I could hear him, and then the two detectives were

22  communicating with Detective Henderson through their encrypted

23  radio, and I could also hear the transmissions through the

24  radio through the phone.

25  Q.   And once the information was conveyed that they had

1   observed traffic violations, what were you told to do?  How did
2   you proceed?
3   **A.**   They continued surveillance of the vehicle as it was
4   driving, so I went to where they told me the vehicle was
5   traveling, and once I was behind it, I initiated the traffic
6   stop.
7   **Q.**   What area was that?
8   **A.**   That was in the area of Thurman and Elm.
9   **Q.**   When you say you "initiated the traffic stop," do you mean
10  you put your lights and sirens on the car?
11  **A.**   Yes.  So the car turned onto Thurman from Elm, and once it
12  turned on there, I activated my red-and-blue lights and that's
13  how I initiated the traffic stop.
14  **Q.**   Was this a little bit after 5:00 p.m.?
15  **A.**   Yes.
16  **Q.**   Now, in your report that you later wrote, you indicated
17  that Detective Henderson relayed the information about the
18  traffic violations.  Today you seem to be indicating that that
19  was coming from Detective Shiparski.  Can you explain the
20  discrepancy between those two?
21  **A.**   Yes.  At the time of making the stop, I believed it was
22  Detective Henderson because we were all speaking on this
23  conference call and it was a radio communication, so I was just
24  confused as to who had actually viewed it because we were all
25  talking on the same line.

1    Q.   Now, you mentioned earlier that you had your body camera on

2    that day.  Did you begin the recording at the beginning of the

3    traffic stop?

4    A.   Yes.

5    Q.   And I'm going to pull up a -- the first screenshot and

6    pause on a body camera recording that's been marked as

7    Exhibit 4.

8         Now, this shows December 9th, 2019, 23:03:59.  You

9    said this was a little after 5:00 p.m.  Can you explain what's

10   going on with the time that this happened versus the time the

11   body camera shows?

12   A.   I'm not sure why the body camera displays that time

13   exactly.  However, it's incorrect to the accurate time that

14   that occurred.

15   Q.   Now, have you watched -- does this video, this first

16   screenshot that we're looking at, does it truly and accurately

17   depict your interactions that occurred on the late afternoon,

18   early evening of December 9th, 2019?

19   A.   Yes.

20   Q.   Is this video approximately 15 and-a-half minutes long?

21   A.   Yes.

22        MS. DONNELLY:  Your Honor, I would seek to admit

23   Government's Exhibit 4.

24        THE COURT:  Any objection, Mr. Jones?

25        MR. JONES:  No, Your Honor.

1          THE COURT:  Government's Exhibit 4 is admitted without

2    objection.

3          MS. DONNELLY:  And, Your Honor, I would seek leave to

4    publish.  I intend to play probably about six or seven minutes

5    and pause and ask the witness questions and then just admit the

6    rest but not publish.

7          THE COURT:  Granted.

8          MS. DONNELLY:  Now, I am going to press play here.

9          (video played.)

10   Q.   Now, the first thing that you said was that you stopped the

11   car for rolling a couple stop signs on Elm.  Was that the

12   information that you had about the traffic violations that had

13   occurred?

14   A.   Yes.

15   Q.   And was the driver the only person that was in the car?

16   A.   Yes.

17   Q.   Now, we couldn't clearly hear the driver's response.  What

18   was it that he told you about a driver's license?

19   A.   He told me that he didn't have a driver's license.  All he

20   had was an ID card.

21   Q.   And is driving without a license a misdemeanor offense for

22   which a driver can be arrested?

23   A.   It would be a misdemeanor offense if he had never received

24   a license.

25   Q.   Now, here we're paused at, it looks like, 23:04:57, and

1    there's two other individuals that we can see on the passenger

2    side of the car while you were on the driver side of the car.

3    Who are those two people?

4    A.   I believe that's Detective Henderson and Officer Oberle.

5    Q.   As you now have, I guess, the ID card of the driver and the

6    license -- I'm sorry -- the registration documents, what are

7    you going to do?

8    A.   At this point I'm going to return to my vehicle and then

9    check BMV records for his license plate as well as his driving

10   history with his ID card.

11   Q.   All right.  Pressing play again.

12          (Video played.)

13   Q.   Now, here, as you're pulling up the in-car computer system,

14   are you, in fact, doing what you just mentioned, starting the

15   checks for license and registration?

16   A.   Yes.

17          (Video played.)

18   Q.   Now, the "Babcock, get him out," what was that?

19   A.   That was Officer Oberle telling me to get him out, but that

20   was after his K-9 alerted to the vehicle.

21   Q.   And when you got that notification on your radio, were you

22   still waiting on the results for the license and registration

23   check that we saw you doing?

24   A.   Yes.

25   Q.   Now continuing to press play.

 1              (Video played.)

 2   Q.   Now, Officer Babcock, as he got out of the car, was that

 3   Corporal Henderson who conducted the pat-down?

 4   A.   Yes.

 5   Q.   And then he is also the person who actually detained

 6   Mr. Seay in handcuffs?

 7   A.   Yes.

 8   Q.   Now, on the other side of the car was then Officer/now

 9   Corporal Oberle doing something else?

10   A.   Yes.  He was initiating a search of the vehicle.

11   Q.   I am going to -- I had hit pause there at 23:08:03.

12   Pressing play again.

13              (Video played.)

14   Q.   Now, where is Mr. Seay being taken at this point?

15   A.   He's being taken to the Michigan City Police Department for

16   booking procedures.

17   Q.   And are you the individual who is going to transport him?

18   A.   Yes.

19   Q.   And I heard there Corporal Henderson discussing searching

20   before being put into your car.  Why is it that someone is

21   searched before being transported?

22   A.   It's common procedure to search someone incident to their

23   arrest.

24   Q.   And also for officer safety to ensure there's no items on

25   that person that could be used against you during transport?

1  A.   Correct.

2         (Video played.)

3  Q.   And here I'll stop it at 23:10:13.  Do you, in fact, get

4  Mr. Seay into your car and transport him back to the station?

5  A.   Yes.

6  Q.   And based on where this traffic stop occurred and where the

7  Michigan City police station is located, did that drive --

8  about how long did that take?

9  A.   A minute or two minutes.

10  Q.   And was Mr. Seay brought into lockup around 5:15 p.m.?

11  A.   Yes, ma'am.

12         MS. DONNELLY:  No further questions, Your Honor.

13         THE COURT:  Thank you, Ms. Donnelly.

14         Cross, Mr. Jones.

15                     CROSS-EXAMINATION

16  BY MR. JONES:

17  Q.   Officer Babcock, how long have you been a Michigan City

18  police officer?

19  A.   Three years.

20  Q.   Did you attend the police academy?

21  A.   Yes.

22  Q.   What other training do you have?

23  A.   So prior to being an officer with Michigan City, I worked

24  with the Indiana University Police Department for about a year

25  and a half and have gone through miscellaneous trainings.

1  **Q.**  So somewhere along in your training, I assume you took a
2  course or had a seminar on writing reports?
3  **A.**  Yes.
4  **Q.**  When you write a report, it's important to put all of the
5  important facts in the report, correct?
6  **A.**  Yes.
7  **Q.**  Now, you can't put everything in, right?
8  **A.**  Correct.
9  **Q.**  You have to put what's important in the report so other
10  people can read and rely on it; would you agree with that?
11  **A.**  I would, yes, sir.
12  **Q.**  Is that what you did here in this case?
13  **A.**  Yes.
14  **Q.**  Yes?
15  **A.**  Yes.
16  **Q.**  And your report is a one-page report that's entitled
17  "Original Narrative," correct?
18  **A.**  Correct.
19  **Q.**  And you put in here what you felt as part of the traffic
20  stop what you thought were the important facts for other people
21  to know?
22  **A.**  Yes.
23  **Q.**  Now, you have an opportunity if you make a mistake to go
24  back and correct the report, correct?
25  **A.**  For a short period of time, yes.

1    Q.   What do you mean?

2    A.   Well, I mean, once that report is submitted and approved by

3    a supervisor, I don't go back and change it after that.  But

4    while I'm typing it, I can, of course, correct mistakes.

5    Q.   Well, if you had the wrong person, you can certainly go

6    back and write a supplement or correct an error, I assume?

7    A.   Correct.  That would be a supplement.  That wouldn't be

8    editing the original report.

9    Q.   So depending on the time, Officer, if you find that you

10   have an error in your report or perhaps you were confused, you

11   can go back and create another report called a supplement

12   report to put the world on notice that Officer Babcock was

13   confused and now here are the facts as I currently understand

14   them; would that be accurate?

15   A.   Yes.

16   Q.   Did you do that?

17   A.   No.

18   Q.   Have you had a chance to review your one-page report before

19   coming here today?

20   A.   Yes.

21   Q.   And when did you do that?

22   A.   About last week.

23   Q.   Does your report mention Detective Shiparski's name

24   anywhere?

25   A.   No.

1   Q.   Does it mention Detective Fish's name anywhere?

2   A.   No.

3   Q.   Does it mention receiving a call to go -- my words -- stage

4   at the Michigan City Police Department?

5   A.   No.

6   Q.   Does it reference a hand-to-hand transaction by the person

7   that you were going to stop?

8   A.   No.

9   Q.   Does it reference any suspected drug dealing?

10  A.   I don't believe so.

11  Q.   Does it mention Detective Henderson's name ten times?

12  A.   I know it mentions it.  I don't know the exact number.

13  Q.   Would you be surprised that you mentioned on one page

14  Detective Henderson's name ten times?

15  A.   No.

16  Q.   You know Detective Henderson, right?

17  A.   Yes.

18  Q.   He was on the police force when you joined, correct?

19  A.   Correct.

20  Q.   Did you know him before the police force?

21  A.   No.

22  Q.   You've spoken with him?

23  A.   Yes.

24  Q.   You recognize his voice?

25  A.   Yes.

1    Q.   You recognize him by sight?

2    A.   Yes.

3    Q.   As a matter of fact, looking at the exhibit we just looked

4    at, he was one of the first officers at the car while you were

5    walking up, correct?

6    A.   Yes.

7    Q.   You saw his head on the other side, right?

8    A.   Yes.

9    Q.   Now, your report says that the stop happened about 5:00.

10   Would you agree with that?

11   A.   Yes.

12   Q.   Regardless of what the timestamp says on your body camera?

13   A.   Yes.

14   Q.   And your report says you were advised by Detective Corporal

15   Henderson, right?

16   A.   Yes.

17   Q.   And you knew that because your report says Henderson was

18   conducting surveillance in the area?

19   A.   Yes.

20   Q.   Do you know that because that's what he told you?

21   A.   That's what I believed because of the conference call.  I

22   heard Detective Henderson's voice as they were talking to each

23   other on the radio and then through the phone.

24   Q.   All right.  Now, your report says that Detective Henderson

25   relayed, by my count, twelve facts to you.  Detective Henderson

1  told you that he saw a car, correct?

2  A.  Correct.

3  Q.  And that car was black, correct?

4  A.  Correct.

5  Q.  And Detective Henderson told you that it was a Nissan?

6  A.  Correct.

7  Q.  And Detective Henderson told you that the car had tinted

8  windows?

9  A.  Correct.

10  Q.  And he told you that the car was moving?

11  A.  Yes.

12  Q.  And he told you specifically that the car was moving

13  southbound, correct?

14  A.  Yes.

15  Q.  And it was on Main Street?

16  A.  Yes.

17  Q.  And Detective Henderson told you that it was at Main near

18  Elm Street?

19  A.  Correct.

20  Q.  He also relayed information to you that the Nissan had a

21  license plate affixed to the back of the vehicle, correct?

22  A.  Correct.

23  Q.  And he gave you some facts about that license plate.  He

24  told you that it started with the initials "EM," correct?

25  A.  Correct.

1   Q.   And that it had a cardinal on it?

2   A.   Yes.

3   Q.   What did you understand that to mean?

4   A.   Indiana has a lot of different plate types and so those

5   first two letters along with that symbol on that plate

6   indicated a particular plate.

7   Q.   And your report indicates that Detective Henderson told you

8   that the car or the person driving the car had committed

9   multiple traffic violations, correct?

10  A.   Correct.

11  Q.   And then, specifically, Detective Henderson told you that

12  he failed to come to a complete stop at multiple stop signs,

13  correct?

14  A.   Correct.

15  Q.   And you relied on Detective Henderson's recitation of those

16  twelve facts in order for you to conduct a traffic stop,

17  correct?

18  A.   Correct.

19  Q.   Because you personally didn't witness the defendant commit

20  an infraction; is that accurate?

21  A.   That's accurate.

22  Q.   So you personally didn't have any probable cause, correct?

23  A.   Correct.

24  Q.   You relied on Detective Henderson telling you all of these

25  facts regarding the infraction?

 1   **A.**   Yes.

 2   **Q.**   You agree that your report doesn't say that Detective Fish

 3   told you about the infractions?

 4   **A.**   Correct.

 5   **Q.**   And you agree that your report doesn't say Officer

 6   Shiparski told you about the infractions?

 7   **A.**   Correct.

 8   **Q.**   And your report doesn't mention any cell phone conference,

 9   correct?

10   **A.**   Correct.

11   **Q.**   You end your report that you affirm under the penalties of

12   perjury that the facts in this report are true and accurate?

13   **A.**   Yes.

14   **Q.**   Now, when you made this stop, the initial stop, there was

15   no contraband in plain view, correct?

16   **A.**   Correct.

17   **Q.**   The defendant was respectful to you?

18   **A.**   Yes.

19   **Q.**   Nothing unusual about the interior of the car?

20   **A.**   No.

21   **Q.**   Didn't smell any alcohol?

22   **A.**   No.

23   **Q.**   I would assume that's a common thing you might look for

24   when you conduct a stop, right?

25   **A.**   Yes.

1   Q.   You also look for the smell of narcotics?

2   A.   Yes.

3   Q.   Did you smell any narcotics?

4   A.   No.

5   Q.   So in your mind, at least, this was going to be a

6   routine -- well, it's not really routine because you've been

7   waiting for it, correct?

8   A.   Correct.

9   Q.   Was this an unusual traffic stop for you then?

10  A.   No.

11  Q.   Tell me why it's not unusual to stage at the Michigan City

12  Police Department before an infraction occurs knowing full well

13  that you're going to go stop somebody for an infraction?

14  A.   I've worked frequently with the LaPorte County Drug Task

15  Force in the past, so we've frequently conducted investigations

16  in that way.

17  Q.   But you frequently talk with Detective Henderson?

18  A.   Yes.

19  Q.   And Shiparski?

20  A.   Yes.

21  Q.   And Fish?

22  A.   Yes.

23  Q.   I mean, how often?

24  A.   As often as they call me.  Maybe every couple weeks.  It

25  might be a couple of days.

BABCOCK - CROSS EXAMINATION

1    **Q.**   You know these guys?

2    **A.**   Yes.

3    **Q.**   So do you find it unusual that you posted up for something

4    that hadn't yet occurred?

5    **A.**   No.

6    **Q.**   Did they tell you what they thought was going to occur?

7    **A.**   As far as the particular infraction?

8    **Q.**   Yes, sir.

9    **A.**   No.

10   **Q.**   What did you anticipate then?

11   **A.**   I anticipated that they were going to do surveillance, and

12   if they needed a uniform patrol marked unit that they would

13   call and let me know.  In this case, we were already on the

14   phone, and they'd let me know what they wanted me to do.

15   **Q.**   And Detective Henderson said, hey, this Nissan rolled

16   multiple stop signs; go conduct a stop?

17   **A.**   Correct.

18   **Q.**   Why do your tickets have the wrong time on them?

19   **A.**   So the tickets have the wrong time probably because that's

20   when they were written.  So after the K-9 alerted to the

21   vehicle, I then went back to the vehicle.  We detained Mr. Seay

22   in handcuffs and transported him to the station.  I didn't

23   complete writing the tickets at that point until the time

24   that's marked on the tickets.

25   **Q.**   Well, the tickets say that he committed the infraction on

1    12/9/19 at 7:14 p.m.  That's not when he committed the

2    infraction?

3    **A.**    No.

4    **Q.**    Tell me again, you put the time of the infraction down as

5    the time you write the report?

6    **A.**    I'm not sure if that's the time I put on there or if that's

7    automatically generated at the time that I started writing

8    those tickets.  So since I started writing the tickets after

9    Mr. Seay was taken to the police department and booked, that

10   would be the reason why the time's on there.

11            MR. JONES:  Pass the witness.

12            THE COURT:  Thank you, Mr. Jones.

13            Redirect, Ms. Donnelly?

14            MS. DONNELLY:  If I could just have one moment,

15   Your Honor?

16            THE COURT:  Sure.

17            MS. DONNELLY:  No questions, Your Honor.

18            THE COURT:  Okay.  Officer Babcock, you're done, sir.

19   Thank you.  Have a nice day.

20            THE WITNESS:  Thank you.

21            THE COURT:  Thank you.

22            Your next witness, Ms. Donnelly.

23            MS. DONNELLY:  Willie Henderson, Your Honor.

24            (Witness enters courtroom.)

25            THE COURT:  Detective Henderson, good morning.  How

```
 1    are you, sir?

 2            THE WITNESS:  Good.  How are you?

 3            THE COURT:  I'm very well.  Thank you, sir.  If you

 4    would raise your right hand.

 5            (Oath Administered to the Witness.)

 6            THE WITNESS:  I do.

 7            THE COURT:  Thank you, sir.  Please have a seat.

 8            You can remove your mask while testifying.  If you

 9    would, please, state your name and spell it for the record,

10    please.

11            THE WITNESS:  Willie Henderson, W-i-l-l-i-e, last name

12    H-e-n-d-e-r-s-o-n.

13            THE COURT:  Thank you, sir.

14            Ms. Donnelly.

15            MS. DONNELLY:  Thank you, Your Honor.

16                          WILLIE HENDERSON,

17    having been duly sworn, was examined, and testified as follows:

18                          DIRECT EXAMINATION

19    BY MS. DONNELLY:

20    Q.  Can you please tell us where you work and what your

21    position is there.

22    A.  I'm employed at the Michigan City Police Department.  I'm

23    currently assigned to the LaPorte County Drug Task Force.  I'm

24    a corporal detective at the department.

25    Q.  And how long have you worked in law enforcement?
```

1   A.   Approximately eight years.

2   Q.   Were you on duty on the afternoon of December 9th of 2019?

3   A.   I was.

4   Q.   Around 4:00 in the afternoon, where were you physically

5   located?

6   A.   I was physically at the police department.

7   Q.   And were some of your partners with the LaPorte County Drug

8   Task Force out on the street conducting surveillance?

9   A.   They were.

10  Q.   Who was that?

11  A.   Corporal Shiparski and Detective Jim Fish.

12  Q.   On who were they conducting surveillance?

13  A.   Rapheal Seay.

14  Q.   And were you in contact with Detective Shiparski and Fish?

15  A.   I was.

16  Q.   How?

17  A.   At the time via a radio that we had for our unit and a

18  phone call as well.

19  Q.   Okay.  Now, as time moved forward, getting closer to 4:30,

20  4:45, were there patrol officers who also were called to

21  potentially assist?

22  A.   There were.

23  Q.   Which officers were those?

24  A.   Officer Oberle and Officer Babcock.

25  Q.   And between 4:00 and 5:00 p.m., were you aware of the

1   general area that Detective Shiparski and Fish were conducting

2   surveillance in?

3   **A.**   I was.

4   **Q.**   Approximately how close was that to the police department?

5   **A.**   Approximately four blocks, maybe.

6   **Q.**   And as time gets closer to 5:00 p.m., what is it that

7   Detectives Shiparski and Fish tell you?

8   **A.**   Initially, they told me that Rapheal was leaving in a

9   vehicle, so I left the station -- I was working on a different

10  case at the time -- to assist them with surveillance in hopes

11  of observing a traffic infraction; however, that was never

12  observed, and we actually lost sight of him for the time being.

13  At that point in time, I went back to the station.

14  **Q.**   And then what's the next thing that you hear from them?

15  **A.**   I got contacted again saying that they observed what

16  appeared to be a hand-to-hand transaction and then they later

17  informed me that Seay was getting back in that vehicle again,

18  so I left the station once again.

19  **Q.**   Where did you go?

20  **A.**   I left the station, I went south on Cleveland Avenue which

21  runs north and south, traveled southbound to Thurman, and I

22  parked just a couple blocks west of Cleveland on Thurman

23  Avenue.

24  **Q.**   And were you aware at that time of what Officers Babcock

25  and Oberle were doing?

1   **A.**   I was.  They were standing by right near the Michigan City

2   Police Department waiting to be summonsed by the detectives

3   that were doing the surveillance.

4   **Q.**   And can you explain how it was that, I guess, all five of

5   you were in communication with each other?

6   **A.**   Myself and Detective Fish along with Corporal Shiparski

7   were communicating primarily via our unit-specific radio

8   frequency, and Detective Fish and Corporal Shiparski were in

9   contact with Oberle and Babcock via, like, a three-way call

10  that was merged together.  It was on Corporal Shiparski's

11  Bluetooth audio in his car.

12  **Q.**   And were there times when you were hearing from Detective

13  Shiparski and Fish where you could essentially through the

14  radio hear the background of that call that was also going on?

15  **A.**   There were.

16  **Q.**   Now, you said the hand-to-hand transaction happened, and

17  then what was it that Detectives Shiparski and Fish conveyed

18  after that?

19  **A.**   They let me know that Seay was getting back in the vehicle

20  that was at the house that he previously left in.

21  **Q.**   So after you left the station and parked in the area, were

22  you in an unmarked vehicle?

23  **A.**   I was.

24  **Q.**   And what did you hear from Detectives Shiparski and Fish of

25  what happened next?

1    A.    That he traveled -- Seay traveled southbound on Elm Street

2    from the house that was located at the corner of Elm and Main

3    and failed to come to a complete stop at two stop signs while

4    traveling southbound.

5    Q.    What happened after that?

6    A.    Officer Babcock was summonsed to conduct a traffic stop on

7    the vehicle.  I was parked on Thurman Avenue.  I actually saw

8    Seay turn -- it would be eastbound coming directly at me,

9    followed shortly behind Officer Babcock.  I then traveled

10   westbound a little bit from my location to conduct a U-turn to

11   back up Officer Babcock; observed Seay essentially park the

12   vehicle, which appeared to be trying to avoid being stopped,

13   and then Babcock initiated the traffic stop on him.

14   Q.    And once Officer Babcock initiated the traffic stop, did

15   you get out of your car to assist?

16   A.    I did.  I did a U-turn and then backed him up.  I was the

17   primary officer that backed him up.

18   Q.    And did you have your body camera recording at that time?

19   A.    I did.

20   Q.    I'm going to show you the opening screenshot of a video

21   that's been marked as Government's Exhibit 5.

22           (Video displayed.)

23   Q.    Right here we are stopped at the time of 23:03:52.  Do you

24   recognize this video?

25   A.    I do.

1    Q.   And is this the beginning of an approximately 22-minute-

2    long video of your interactions that late afternoon, early

3    evening?

4    A.   It is.

5    Q.   Do they truly and accurately depict what happened?

6    A.   They do.

7    Q.   As to the time, on the video, it shows 23:03:52.  We've

8    been talking about this as happening around 5:00 p.m.  Why is

9    it that there's that difference?

10   A.   There's errors on the body cameras all the time.  A lot of

11   times with time zone changes, sometimes just for no reason all

12   the times are inaccurate.

13           MS. DONNELLY:  Your Honor, I seek to admit

14   Government's Exhibit 5.

15           THE COURT:  Mr. Jones?

16           MR. JONES:  No objection.

17           THE COURT:  Government's Exhibit 5 is admitted without

18   objection.

19           MS. DONNELLY:  And I'd also seek leave to publish a

20   portion of the video.

21           THE COURT:  Granted.

22           (Video played.)

23   BY MS. DONNELLY:

24   Q.   I'm pausing here at 23:06:38.  Now, there's a number of

25   things that happened there.  One of it, I guess, initially you

1   began talking to the driver; is that correct?

2   A.   I did.

3   Q.   And do you see anyone in court here today who was, in fact,

4   the driver of that car?

5   A.   I do.  Rapheal Seay seated straight across from me

6   (indicating).

7        MS. DONNELLY:  Your Honor, I would ask that the record

8   reflect an in-court identification.

9        THE COURT:  Any objection, Mr. Jones?

10        MR. JONES:  No, Your Honor.

11        THE COURT:  The record will so reflect.

12   BY MS. DONNELLY:

13   Q.   Mr. Seay was on the phone for a period of time?

14   A.   He was.

15   Q.   And then you asked him to roll the windows up.  Why was

16   that necessary to happen before Officer Oberle brought his K-9

17   partner up?

18   A.   That's just the request that he made.  He has more training

19   in that, so I don't know why, but it was a request he made so I

20   relayed it to the driver.

21   Q.   Okay.  And then we saw on one side of the screen as Officer

22   Oberle and his K-9 partner walked around the side of the car.

23   Obviously, like you said, he's the one who did it, but were you

24   aware of having happened when he did that?

25   A.   He began to conduct a free-air sniff with his K-9 partner

1    Axel, and then he informed us that he obtained a positive alert

2    from his dog.

3    **Q.**   At that point with the positive alert, I heard you say:

4    "Tell Babcock come up here."  Why was that?

5    **A.**   Because then we established probable cause to search the

6    vehicle, so we were going to bring additional officers up to

7    conduct the search.

8    **Q.**   All right.  I'm going to press play.

9           (Video played.)

10   **Q.**   So I'm stopping here at 23:08:47.  And Officer Oberle, who

11   is on the other side, the passenger side of the car, what is it

12   that he just told you?

13   **A.**   He said, "He's got a gun."

14   **Q.**   Now, when Mr. Seay got out of the car, you conducted a

15   pat-down of him.  Why is it that you did a pat-down?

16   **A.**   Based on the alert from the dog as well as officer safety.

17   **Q.**   And was part of the information that the Drug Task Force

18   had here was that not just that Mr. Seay was selling drugs but

19   also had guns?

20   **A.**   Correct.

21   **Q.**   Now, after Officer Oberle informed you that he had a gun on

22   the passenger side, did you, in fact -- strike that.

23          First, was Mr. Seay brought back to Officer Babcock's

24   car to be transported to the station?

25   **A.**   He was.

1   Q.   And then did you assist with Officer Oberle essentially

2   collecting the gun, photographing the car, and collecting the

3   other evidence?

4   A.   I did.

5   Q.   Namely, was the cell phone on the roof of the car

6   collected?

7   A.   It was.

8   Q.   As well as the jar that contained suspect marijuana?

9   A.   It was.

10  Q.   Now, later that evening around 7:00 p.m., did you and

11  Detective Shiparski interview Mr. Seay in one of the rooms at

12  the Michigan City police station?

13  A.   We did.

14  Q.   And before speaking with him, was he advised of his *Miranda*

15  warnings through a preprinted form?

16  A.   He was.

17       MS. DONNELLY:   Your Honor, I have no further

18  questions.

19       THE COURT:   Thank you, Ms. Donnelly.

20       Cross, Mr. Jones.

21                       CROSS-EXAMINATION

22  BY MR. JONES:

23  Q.   Corporal Detective Henderson, after the dust settled, this

24  was a state court case to begin with, correct?

25  A.   Initially it was, yes, sir.

1    **Q.**    Initially.  Who was the lead detective or the detective

2    that would have been in charge of the state court case?

3    **A.**    Are you asking who filed the charging information and

4    stuff?

5    **Q.**    Well, was there one officer that was kind of lead on this

6    case while it was in state court?

7    **A.**    I wouldn't say that.  We kind of work as a unit.  I'm not

8    sure who actually filed the charging information though.

9    **Q.**    Did you have an opportunity to review the various police

10   reports that were generated as a result of this traffic stop?

11   **A.**    I have.

12   **Q.**    And did you review Officer Babcock's one-page narrative?

13   **A.**    I did.

14   **Q.**    And you know Officer Babcock, correct?

15   **A.**    I do.

16   **Q.**    You've been on the force did you say seven or eight years?

17   **A.**    Approximately eight years.

18   **Q.**    About eight years.  And he's been on the force three years?

19   **A.**    Yes, sir.

20   **Q.**    You work with him on a weekly basis?

21   **A.**    No, actually I don't work with him at all.  I've never

22   worked patrol with him.  He's a patrolman and I work on the

23   Drug Task Force.

24   **Q.**    I know that.  I mean, he's testified that he has

25   interactions with you because those two departments work

```
 1   cooperatively together.
 2   A.   Yeah, in situations like this where we need their
 3   assistance.
 4   Q.   You know each other?
 5   A.   Correct.
 6   Q.   He's not a stranger to you?
 7   A.   No, sir.
 8   Q.   You're both members of the Michigan City Police Department?
 9   A.   Yes, sir.
10   Q.   You're assigned to the Drug Task Force and he's assigned to
11   the Patrol Division?
12   A.   Yes, sir.
13   Q.   And your paths cross in a professional way when you're
14   doing your job as a police officer?
15   A.   Yes, sir.
16   Q.   Are you also social friends with him or not?
17   A.   Not so much, no.
18   Q.   Okay.  So I'm looking at your narrative report, Detective
19   Henderson.  It's a report that you wrote about what happened,
20   correct?
21   A.   Yes, sir.
22   Q.   It was written the day after the traffic stop?
23   A.   Yes, sir.
24   Q.   The stop was about 5:00 p.m. on the 9th of December, right?
25   A.   Yes, sir.
```

1   Q.   And we've seen the body cams.  It looks to me like you were

2   there seconds after the vehicle was stopped?

3   A.   Yes, sir.

4   Q.   Okay.  And your report accurately says that Officer Babcock

5   was the one that conducted the stop?

6   A.   Yes, sir.

7   Q.   And your report says that several traffic infractions were

8   observed by Detective Fish and Corporal Shiparski?

9   A.   Yes, sir.

10  Q.   You didn't observe any traffic infractions?

11  A.   I did not.

12  Q.   Where were you when the Nissan was rolling through these

13  stop signs on Elm?

14  A.   I was on Thurman street, the street that it was stopped on.

15  Q.   You were in the location where you began and ended

16  this what we see in the body cam, right?  You never moved?

17  A.   I did move.  I was parked on Thurman Avenue.  Seay's

18  vehicle, the Nissan, and Babcock actually drive past me.  I

19  conduct a U-turn and back him up.  That's why I'm there so

20  quick.

21  Q.   Okay.  You see the Nissan go by you and you see Babcock go

22  by you?

23  A.   Correct, they traveled eastbound past me.  I went half a

24  block to the intersection, did a U-turn, and backed up Officer

25  Babcock.  I was there within seconds.

1  Q.   Okay.  When you see them, had Babcock already activated his

2  lights and sirens?

3  A.   That I don't recall.  I'm not sure.

4  Q.   Regardless, he was stopped seconds after you personally had

5  eyes on them?

6  A.   Correct.

7  Q.   In other words, you didn't tell Officer Babcock that this

8  Nissan had committed multiple traffic violations because you

9  didn't see him commit multiple traffic violations, correct?

10  A.   Correct, I did not tell him.

11  Q.   And you didn't convey to Officer Babcock that the subject

12  vehicle was a black car?

13  A.   Correct.

14  Q.   Or that it was a Nissan or that it had tinted windows?

15  A.   Correct.

16  Q.   Or that he was even moving, because that was already

17  communicated, correct?

18  A.   Correct, I would not have directly communicated that to

19  Officer Babcock.

20  Q.   And you did not communicate to Officer Babcock the status

21  of the license plate, in other words, that it had the initials

22  at least "EM" on it and perhaps a cardinal; you wouldn't have

23  known that, right?

24  A.   No.

25  Q.   You may have known it afterwards, but before the stop you

1   didn't know that?

2   A.   Correct.

3   Q.   And when you get to the scene, as I look at the body cam

4   and read your report, you're on the passenger side of the

5   vehicle?

6   A.   Correct.

7   Q.   Do you see any contraband in plain view?

8   A.   I do not.

9   Q.   Do you smell anything?

10  A.   I do not.

11  Q.   Alcohol, drugs?

12  A.   That I don't recall about alcohol.  There may have been a

13  bottle in the cup holder, but as far as drugs and weapons, no.

14  Q.   So at this point it's a traffic stop for a rolled stop

15  sign, and right now you don't have any probable cause, correct?

16  "Right now" in the sequence of events.

17  A.   Probable cause for what?

18  Q.   To stop him, arrest him.

19  A.   They had probable cause to stop the car.  They observed the

20  infraction.

21  Q.   Right.  But for any kind of search or any other kind of

22  additional charges other than an infraction?

23  A.   At that point in time, no.

24  Q.   But before you stopped -- not before you stopped him -- but

25  before Michigan City police stopped him, were you the one that

1   called Babcock and said, "get ready," more or less?

2   **A.**   Called him and said "get ready"?

3   **Q.**   Yeah.  Babcock and Oberle were staged near the Michigan

4   City police station, correct?

5   **A.**   Yes, they were in the west lot there off Cleveland Avenue.

6   **Q.**   What were they doing?

7   **A.**   Waiting to be summoned.

8   **Q.**   Right.  Who told them to go there and wait?

9   **A.**   One of us.  I'm not sure.

10  **Q.**   Did you do that?

11  **A.**   I don't recall.  I may have.

12  **Q.**   So when Shiparski then and Fish observe the traffic

13  infractions, that's when the arresting officer and the K-9

14  officer are summoned?

15  **A.**   Correct.  They were summoned by Shiparski and Fish.

16  **Q.**   "Come to our location; we've observed this guy commit a

17  traffic infraction."

18  **A.**   Correct.  They're requesting assistance to stop the

19  vehicle.

20  **Q.**   In more or less words.  We don't know exactly what they

21  said because there's no tape of what they actually said,

22  correct?

23  **A.**   Correct.

24  **Q.**   So when you're standing there at the side of the car, why

25  do you tell Oberle "Grab your buddy"?

A.   Because of what appeared to be a hand-to-hand transaction completed, in Shiparski's and Fish's view, as well as my awareness of the activity that Mr. Seay involves himself in in Michigan City.

Q.   So the K-9 is staged and ready and then the K-9 is called, and then moments after you have a brief interaction with Mr. Seay, you say, "Grab your buddy."  Are you speaking directly to Officer Oberle?

A.   Correct.  So Officer Oberle is approaching the stop at that time.

Q.   He's out of his vehicle without his dog?

A.   Correct.

Q.   Do you see the dog hit?

A.   I can't remember if I seen him.  I don't think so because he's on the driver's side of the car.  I'm on the passenger side, kind of belated.

Q.   What's the sequence of events, just so I understand them; does the dog hit and then Mr. Seay gets out of the car, or is Mr. Seay out of the car and then the dog hits?

A.   Officer Oberle advised me of the positive alert while Mr. Seay was still inside the vehicle.

Q.   That's when I assume you came around to the driver's side or you told Babcock to get him out --

A.   Correct.

Q.   -- and you conducted the pat-down?

1  **A.**  Correct.

2  **Q.**  Were there ever any drugs found in the automobile?

3  **A.**  I don't believe so.

4  **Q.**  And when you're patting down Mr. Seay for officer safety,

5  do I listen to the body cam correctly, you tell him what he's

6  got even before you take it out?

7  **A.**  Correct.  So I feel a Mason jar in his pocket, which,

8  obviously, through experience, it's very uncommon for somebody

9  to just carry a Mason jar in their pocket.  Through my

10  experience, people store drugs in them, so that's why I asked

11  him if he's got weed in the jar.

12  **Q.**  Did you process that jar eventually?

13  **A.**  I did.

14  **Q.**  Let's talk about your training and experience in the

15  process of this jar.  Why do people keep their narcotics in a

16  Mason jar?

17  **A.**  Primarily to help conceal the odor.

18  **Q.**  Is this mostly marijuana or is it different narcotics?

19  **A.**  It varies.  I mean, there's tons of different storage

20  devices now.

21  **Q.**  I meant as far as Mason jars go.

22  **A.**  Yeah, various.  Typically you see marijuana in them though.

23  **Q.**  That's been your training and experience, that marijuana is

24  sometimes stored in a Mason jar?

25  **A.**  Correct.

1   Q.   To prevent odor detection?

2   A.   Well, to try to prevent it.

3   Q.   Were you able when you handled the Mason jar to smell any

4   narcotics?

5   A.   Yes.

6   Q.   Before you opened it?

7   A.   Yes, sir.

8   Q.   Is that noted in your report, sir?

9   A.   I don't know.  It may not be.

10  Q.   So I guess you believed that the drug dog hit on the Mason

11  jar that was in his pocket?

12  A.   I don't know what the dog hit on.  I'm not trained in that.

13  Officer Oberle could tell you what his dog hit for.  I can just

14  tell you what was found on Mr. Seay.

15  Q.   Fair enough.

16          MR. JONES:  That's all the questions I have.

17          THE COURT:  Thank you, Mr. Jones.

18          Redirect, Ms. Donnelly?

19          MS. DONNELLY:  No, Your Honor.

20          THE COURT:  Thank you.

21          Detective Henderson, you're done, sir.

22          THE WITNESS:  Thank you, Your Honor.

23          THE COURT:  You can step down.  Have a good day.

24          Ms. Donnelly, is Corporal Oberle your last witness?

25          MS. DONNELLY:  He is, Your Honor.

1          THE COURT:  Do you intend to have any evidence,

2    Mr. Jones?

3          MR. JONES:  No, Your Honor.

4          THE COURT:  Can we take, then, just a brief recess and

5    then we'll come back and finish up with testimony from Corporal

6    Oberle, and then I'll be happy to receive any argument.  But

7    I'd like to just take a brief recess and then we'll finish up.

8          MS. DONNELLY:  Thank you, Your Honor.

9          THE COURT:  Okay.  See you shortly.

10          (Brief recess taken at 11:45 a.m. until 12:01 p.m.)

11          THE COURT:  Please be seated.

12          Ms. Donnelly, if you would call your next witness.

13          MS. DONNELLY:  Thank you, Your Honor.

14          Michael Oberle.

15          (Witness enters courtroom.)

16          THE COURT:  Corporal, good morning or good afternoon,

17    I guess.  How are you, sir?

18          THE WITNESS:  Good, sir.

19          THE COURT:  If you would please raise your right hand,

20    Mr. Schrader will recite the oath.

21          (Oath Administered to the Witness.)

22          THE WITNESS:  I do.

23          THE COURT:  Thank you, sir.

24          Please have a seat.  You can remove your mask while

25    you're testifying if you would like.

```
 1              THE WITNESS:  Thank you, sir.

 2              THE COURT:  You're welcome.

 3              If you would, please, state your name and spell it for

 4    the record.

 5              THE WITNESS:  It's Michael Oberle.  It's O-b, as in

 6    boy, e-r-l-e.

 7              THE COURT:  Thank you, sir.

 8              Ms. Donnelly.

 9              MS. DONNELLY:  Thank you, Your Honor.

10                         MICHAEL OBERLE,

11    having been duly sworn, was examined, and testified as follows:

12                         DIRECT EXAMINATION

13    BY MS. DONNELLY:

14    Q.   Can you please tell us where you're employed and what

15    position you have there.

16    A.   I'm with the Michigan City Police Department.  I'm a

17    corporal.

18    Q.   How long have you been in law enforcement?

19    A.   Ten years.

20    Q.   And do you have any specialized training?

21    A.   I'm a K-9 handler with the police department.

22    Q.   How long have you been a K-9 handler?

23    A.   A little over two and a half years.

24    Q.   And what is your partner's name?

25    A.   Axel.
```

1    Q.   How long have you worked with Axel?

2    A.   Two and a half years.

3    Q.   And did you go through training with Axel to qualify him as

4    a K-9?

5    A.   I did.

6    Q.   What type of items is Axel trained to alert on?

7    A.   He's trained to deal with narcotics, heroin, meth, cocaine,

8    and marijuana.

9    Q.   And were you working with Axel in December of 2019?

10   A.   I was.

11   Q.   How is Axel trained to alert?

12   A.   He has a passive alert which is sitting.

13   Q.   Now, were you on duty the afternoon of December 9th, 2019?

14   A.   I was.

15   Q.   And were you in a marked squad car that day?

16   A.   In a fully marked patrol vehicle, lights on top, decals on

17   the side indicating "police."

18   Q.   Is that a car that Axel also rides in?

19   A.   Yes.

20   Q.   Were you also in full uniform that day?

21   A.   I was.

22   Q.   Around 4:00 in the afternoon, did you begin speaking to

23   some of the investigators from the LaPorte County Drug Task

24   Force?

25   A.   I did.

1  **Q.**  How did that happen?

2  **A.**  I was contacted by Detective Henderson advising -- asking

3  if I could be in the area of the police department because they

4  were currently watching a location for somebody that they had

5  been getting complaints about.

6  **Q.**  And did you speak to other investigators with the Drug Task

7  Force?

8  **A.**  I did.

9  **Q.**  And who was that?

10  **A.**  Detective Kyle Shiparski and Detective Jim Fish.

11  **Q.**  How was it that you were in contact with them?

12  **A.**  I received a phone call from Detective Henderson initially

13  when he asked me to be in the area of the police department.

14  **Q.**  And then as you went over to the police department and time

15  went forward, how did Detectives Shiparski and Fish get in

16  touch with you?

17  **A.**  We were almost on like a conference call to where they had

18  called me and I could hear everybody in the background.

19  **Q.**  Was there any other patrol officers who were also on that

20  conference call?

21  **A.**  There was.

22  **Q.**  Who was that?

23  **A.**  Officer Babcock.

24  **Q.**  Okay.  At the time that this happened in December, were you

25  an officer then but you're a corporal now?

1    **A.**    Yes, I was an officer.

2    **Q.**    From your conversations with Detectives Shiparski and Fish

3    on this conference call, moving forward to more around 4:30 to

4    4:45 p.m., what was your understanding of what they were doing

5    at that time?

6    **A.**    That our narcotics detectives or our Drug Task Force, they

7    were in their unmarked vehicles and they were watching a

8    subject who they had previously gotten complaints on.

9    **Q.**    And what were you aware of them observing while they were

10    conducting surveillance?

11    **A.**    That there was -- can you rephrase that, please?

12    **Q.**    Sure.  Did they tell you what they saw while they were

13    conducting surveillance?

14    **A.**    I don't recall the exact details.

15    **Q.**    Okay.

16    **A.**    I remember the fact that they said that they had gotten

17    narcotics complaints on him, and when they ended up saying his

18    name, I remembered it from prior contacts.

19    **Q.**    What name was that?

20    **A.**    Rapheal Seay.

21    **Q.**    Now, as time goes forward and you're still in the parking

22    lot at the Michigan City Police Department and it gets closer

23    to 5:00 p.m., what happens at that point?

24    **A.**    While we're on this conference call, we were notified that

25    Seay was driving a black Nissan and he was heading south on Elm

1    and committed traffic violations.

2    Q.   And where did you go once you knew that?

3    A.   I began to follow Babcock as he went west on Treemont and

4    then we turned on Elm Street.

5    Q.   What happened then?

6    A.   Once Babcock conducted the traffic stop on the black

7    Nissan, I pulled up just moments later.

8    Q.   Other than yourself and Officer Babcock, was there another

9    officer or detective who was also stopped at the time of the

10   traffic stop?

11   A.   Detective Henderson.

12   Q.   And when you pulled up and stopped your car, did you start

13   your body camera recording?

14   A.   I did.

15   Q.   I'm opening up and showing you the first screenshot from

16   what's been marked as Government's Exhibit 6.

17        (Video displayed.)

18   Q.   I've paused it at December 9th, 2019, timestamp of

19   23:04:15.  Is this the first shot of an approximately

20   22-minute-long video that captures your interactions on that

21   late afternoon, early evening?

22   A.   Yes.

23   Q.   And does it truly and accurately depict what happened?

24   A.   Yes.

25   Q.   Obviously I said the timestamp was 23:04.  Was this, in

1    fact, around 5:04 p.m.?

2    A.   Yes.

3            MS. DONNELLY:  Your Honor, I would seek to admit

4    Government's Exhibit 6.

5            THE COURT:  Any objection, Mr. Jones?

6            MR. JONES:  No, Your Honor.

7            THE COURT:  Government's Exhibit 6 is admitted without

8    objection.

9            MS. DONNELLY:  All right.  I will press play.

10           (Video played.)

11           MS. DONNELLY:  I'm pausing here at 23:04:59.

12           And I apologize, Your Honor, I know I've already done

13   it at this point, but may I be given leave to publish the

14   exhibit?

15           THE COURT:  Granted.

16           MS. DONNELLY:  Thank you.

17           THE COURT:  You're welcome.

18   BY MS. DONNELLY:

19   Q.   Now, we saw Officer Babcock and Detective Henderson in the

20   video.  Was Officer Babcock going back to his vehicle to check

21   the driver's license and registration information?

22   A.   Yes.

23   Q.   And did you, in fact, later learn that the driver Rapheal

24   Seay had a suspended driver's license?

25   A.   Yes.

1  Q.  And Rapheal Seay, do you see the individual who was the

2  driver of that car in court here today?

3  A.  I do.

4  Q.  Can you please point to that individual and identify an

5  article of clothing they're wearing.

6  A.  Mr. Seay is wearing the green top (indicating).

7        MS. DONNELLY:  Your Honor, I would ask that the record

8  reflect an in-court identification.

9        THE COURT:  Any objection, Mr. Jones?

10        MR. JONES:  No, Your Honor.

11        THE COURT:  The record will so reflect.

12  BY MS. DONNELLY:

13  Q.  Now, as you were walking back to your car, what is it you

14  were going to do at this point?

15  A.  I was going to obtain my K-9 partner Axel.

16  Q.  I'll continue playing.

17        (Video played.)

18  Q.  Can you please describe to us what we saw happen there.

19  A.  That was a positive alert with my K-9.

20  Q.  And in conducting the vehicle sniff, did you follow all

21  procedures that are typically followed when you are asking the

22  K-9 to essentially sniff an area?

23  A.  Yes.

24  Q.  And you said there was a positive alert.  Is that what you

25  alerted Detective Henderson to?

1    **A.**   Yes.

2    **Q.**   And then also Officer Babcock through radioing to him?

3    **A.**   Yes.

4    **Q.**   I'll press play.

5            (Video played.)

6    **Q.**   I'm pausing here at 23:09:11.  You said earlier that Axel

7    had a positive alert.  Where did that positive alert occur?

8    **A.**   On the driver's door.

9    **Q.**   And can you explain his behavior and what happened when he

10   went along the driver's door?

11   **A.**   Once he started at the front of the vehicle, I could tell

12   he was in odor.  The wind was coming over the vehicle to the

13   west towards our direction.  He was leaning forward, he was

14   making his little grunting sound, indicating to me that he's in

15   odor.  As he proceeded along the driver's side of the vehicle,

16   once he got to the driver's door, he had a change of behavior

17   with a head turn.

18   **Q.**   And as he had the change of behavior, what does that tell

19   you?

20   **A.**   That he's in odor.

21   **Q.**   What does "in odor" mean?

22   **A.**   Odor of the narcotics that he's trained to detect.

23   **Q.**   And as he continued, what happened after that?

24   **A.**   I ended up -- when I observed the change of behavior at the

25   door, he turned and looked at me, which is not what he gets

1  rewarded for.  I turned him back around again, started walking

2  the car to see if he showed the same behavior, which he did,

3  and this was followed by a sit.

4  Q.  After the alert happened, you returned him to your car?

5  A.  I did.

6  Q.  And then we could see on the video you eventually walked

7  back up to the car yourself and began the search on the front

8  passenger door?

9  A.  Yes.

10  Q.  And at that time Detective Henderson and Officer Babcock

11  were on the driver's side with Mr. Seay?

12  A.  Yes.

13  Q.  And then we could obviously see this on the video, but what

14  happened shortly after you began the search on the front

15  passenger side?

16  A.  I located a firearm with an extended magazine underneath

17  the front passenger seat.

18  Q.  After this part in the video that we have this paused at,

19  did you then assist Detective Henderson in processing the car

20  by taking photos and packaging the evidence?

21  A.  I did.

22  Q.  Did you also eventually call in the gun to check the serial

23  number?

24  A.  Yes.

25        MS. DONNELLY:  Your Honor, I have no other

1    questions.

2            THE COURT:  Thank you, Ms. Donnelly.

3            Cross, Mr. Jones.

4                         CROSS-EXAMINATION

5    BY MR. JONES:

6    **Q.**   Corporal Oberle, you were called in to stage at the

7    Michigan City Police Department in anticipation of a traffic

8    stop?

9    **A.**   Yes, sir.

10   **Q.**   And you were in your fully marked vehicle?

11   **A.**   I was.

12   **Q.**   Did you park next to somebody?

13   **A.**   I did.

14   **Q.**   Who?

15   **A.**   Officer Babcock.

16   **Q.**   You know Officer Babcock?

17   **A.**   I do.

18   **Q.**   How long have you known him?

19   **A.**   About -- probably about the time he's been a police

20   officer, so I think within five years.  I'm not sure of his

21   tenure.

22   **Q.**   I think he said he'd been there about three years or so.

23   **A.**   Three, okay.

24   **Q.**   You know Corporal Detective Willie Henderson, correct?

25   **A.**   I do.

1    **Q.**   You know Detective Shiparski and Detective Fish?

2    **A.**   I do.

3    **Q.**   You work cooperatively with them throughout your tenure at

4    Michigan City Police Department?

5    **A.**   Yes.

6    **Q.**   While you were on the conference call, you recognize their

7    voices, I assume?

8    **A.**   Yes.

9    **Q.**   You know who you're talking to?

10   **A.**   I do.

11   **Q.**   And you were contacted by Detective Henderson to stage at

12   Michigan City Police Department?

13   **A.**   Yes.

14   **Q.**   Not by Shiparski or Fish?

15   **A.**   No, it was Detective Henderson initially.

16   **Q.**   And you, Corporal Oberle, did not witness a traffic

17   infraction by the black Nissan?

18   **A.**   I did not.

19   **Q.**   You watched your body cam video here we just played.  Which

20   officer asked the question, "Smell anything?"  Did you hear

21   that?

22   **A.**   I'm sorry?

23   **Q.**   Did you hear the officer say "Smell anything?" on your body

24   cam?  Did you hear that?

25   **A.**   Oh, that was my myself.

CROSS-EXAMINATION

1   Q.   That's you talking?

2   A.   That's me, yes.

3   Q.   What was the officer's response to that question?

4   A.   Officer Babcock responded "no."

5   Q.   Did any of the officers respond affirmatively whether they

6   smelled anything?

7   A.   No.

8   Q.   What causes you then to retreat and go back and get your

9   K-9 if all of the officers say we don't smell anything?

10  A.   Because there's -- with marijuana being a very distinct

11  smell, that's generally why I ask, "Can you smell anything?"

12  Because a lot of times with a vehicle, if officers walk up,

13  even if they do smell marijuana, they still ask for a dog to

14  walk around the vehicle, which I generally respond, "We don't

15  need the dog at this point."  So that's why I ask.  It's a

16  general thing I do ask.

17  Q.   Let me understand what you just said because maybe I

18  misunderstood you.

19       You ask whether they smell anything, and if they say

20  "no," you don't need a dog?

21  A.   No, no.  I said if they say yes, as far as like the odor of

22  marijuana, then we don't need the dog.  That's what I was

23  indicating.

24  Q.   I heard it the opposite way.

25  A.   My mistake if I spoke it wrong.  I'm sorry.

CROSS-EXAMINATION

1  Q.   No, that's all right.  If the officer smelled marijuana,

2  you don't need your marijuana detection machine to come and

3  sniff, right?

4  A.   Exactly.

5  Q.   Okay.  So they responded they don't smell anything, so you

6  went and got your dog?

7  A.   Yes.

8  Q.   Your dog is on a leash?

9  A.   Yes.

10 Q.   The leash is in one hand.  What do you have in your other

11 hand?

12 A.   Nothing.

13 Q.   Are you carrying something in your opposite hand?  Do you

14 have a ball or something in your opposite hand?

15 A.   Oh, no, that's inside my vest.

16 Q.   What's inside your vest?

17 A.   It's a tennis ball.

18 Q.   What's the purpose of the tennis ball?

19 A.   It's a reward.

20 Q.   And when do you get the tennis ball out in this particular

21 stop?

22 A.   Once there's a finalization of odor, which is his sit, then

23 there's a reward.

24 Q.   He's a passive alert K-9?

25 A.   Yes.

1   Q.   When he smells narcotics, he sits?

2   A.   Yes.

3   Q.   What language are you speaking to him in?

4   A.   Dutch.

5   Q.   And what commands -- what commands are you giving him?

6   Translate that for us today.  What commands were you saying to

7   the dog as you watched this video?

8   A.   When I end up saying "zoek," that's his command to sniff

9   for narcotics.

10  Q.   Do you know what that word means in English?

11  A.   Basically the translation means that this is his command to

12  search.  It's what's coupled with him to that incident.

13  Q.   What other commands do you give him in Dutch and what do

14  they mean?

15  A.   As far as -- how many do you want me to --

16  Q.   I want all of them.  There was only four or five.  What

17  were your commands to the dog in the video?

18  A.   Okay, so I've got to remember what we used here.

19  Q.   Can we just play it back?

20  A.   It's all right.  I'm pretty sure --

21  Q.   I've got a different question.

22  A.   Okay.

23       MR. JONES:  If we can go back to the 20-second mark on

24  the recorder, not on the body cam.  Thank you.

25       (Video played.)

1  **Q.**  Are you walking back --

2  **A.**  Is that what you're talking about right there?

3  **Q.**  Yes, sir.  Stop it for a moment.  What were those commands,

4  sir?

5  **A.**  So when I first walked around the front of the vehicle and

6  I said "zit," that's sit.  That's his command to sit.

7  **Q.**  And in front of your vehicle?

8  **A.**  No, in front of the black Nissan.

9  **Q.**  And sitting is also the passive alert for the detection of

10  narcotics, correct?

11  **A.**  It is.

12  **Q.**  Then what happened next?

13  **A.**  I commanded "zoek."

14  **Q.**  Which is search or sniff?

15  **A.**  Yes.

16  **Q.**  What are you telling the dog there?  What are you saying

17  then?

18  **A.**  "Good boy."

19  **Q.**  Why are you encouraging the dog before there's a passive

20  alert?

21  **A.**  As far as --

22  **Q.**  Why are you telling the dog that he's doing a good job or

23  that he's a "good boy" before there's a passive alert?  What

24  has the dog done?

25  **A.**  No, he was -- the "good boy" and the ball reward was after

1    the alert.

2    **Q.**    I thought we just heard you say that on the video right

3    there.  I thought you just said it before the alert happened.

4    **A.**    No, the "good boy" proceeded after the alert.

5            MR. JONES:  Can you back it up a few seconds, please.

6    Thank you.

7            (Video played.)

8    **Q.**    Can you show the Court on the video, if it exists, the

9    passive alert to narcotics on this Nissan?

10   **A.**    You can't see it on this from the view here.

11   **Q.**    So you're telling us that your memory is that Axel sat down

12   near the driver's side door?

13   **A.**    Yes.

14   **Q.**    And that was your cue that he had positively alerted on

15   narcotics?

16   **A.**    Yes.

17   **Q.**    How long did he sit there?

18   **A.**    It was just a moment to where, once he came back to that

19   door and sat -- because he came back closer to that door -- so

20   once he got to that seam and sat, he was given that reward.

21   **Q.**    Your voice is caught on video but the dog's actions are not

22   caught on video, correct?

23   **A.**    No, not from what we can see here.

24   **Q.**    I thought on your direct examination you said that the

25   alert was the dog looking toward the car door.

1    **A.**   That was before I spun around this other time, the first

2    time.  Because you can see when just in that -- just before

3    this, when I start walking him to the door, you see him come

4    up, you see the change of behavior where his head comes back to

5    that seam and then he turns and looks at me, so I spun him back

6    around to walk him in front of the door, since having that

7    change of behavior right there; and then as soon as he got to

8    that seam again, he sat.

9    **Q.**   Do you have an explanation as to why that's not captured on

10   the body cam?

11   **A.**   I guess the width of the camera lens.

12            MR. JONES:  That's all the questions I have.

13            THE COURT:  Thank you, Mr. Jones.

14            Redirect, Ms. Donnelly?

15            MS. DONNELLY:  No, Your Honor.  Thank you.

16            (Attorney/Defendant confer off the record.)

17            THE COURT:  Mr. Jones, still no cross?

18            MR. JONES:  No, Your Honor.

19            THE COURT:  Corporal Oberle, you're done.  Thank you,

20   sir.  Have a good day.

21            THE WITNESS:  Thank you, sir.  You too.

22            THE COURT:  Ms. Donnelly, any further evidence?

23            MS. DONNELLY:  No, Your Honor.

24            THE COURT:  Mr. Jones, any evidence?

25            MR. JONES:  No, Your Honor.

1          THE COURT:  Any argument, Mr. Jones?

2          MR. JONES:  Yes, Your Honor.

3          THE COURT:  Okay.

4          MR. JONES:  So we're going to rely on obviously the

5     brief we filed, and specifically the meat of the argument for

6     the Court's consideration is going to be on page 13 which

7     discusses the Collective Knowledge Doctrine.

8          Officer Babcock is the officer taking the action.  He

9     has to have objective reliance on some information that he

10    received.  He's very clear that his report says that Officer

11    Henderson is the one that gave him what I counted to be twelve

12    facts; and, in fact, in his report he lists Officer Henderson's

13    name at least ten times as the officer who provided him with

14    all of the information that began the probable cause in this

15    case.

16         Only then after we filed the motion to suppress does

17    Officer Babcock become confused -- that's his own words -- and

18    say, no, I was confused, it was really a conference call, which

19    is not mentioned anywhere in any of the documents, that they

20    were on an encrypted -- I guess they don't have to mention

21    that.  There's no mention to anybody except today and in the

22    government's brief in preparing this that there was a

23    conference call that discussed all of the facts.

24         So the officer providing the information must have

25    facts supporting the level of suspicion required, and that

1   officer has no personal -- in this case, that officer has no

2   personal knowledge at all of the case.

3           Detective Henderson said that he had a chance to

4   review all of the documents.  Nobody goes back and says, hey,

5   you know, I never told you -- I asked him specifically:  Did

6   you review Officer Babcock's report?  The answer was yes.  I

7   don't doubt that he reviewed it, but that report is very, very

8   clear -- it's attached as, I believe, Exhibit C to our

9   motion -- where ten times Officer Henderson's name is mentioned

10  as the one providing the information that establishes the

11  probable cause.  Interestingly, none of the other officers'

12  names are even mentioned to even kind of cloud the waters as to

13  maybe he got it from this guy or this other guy.  Those

14  officers' names are not mentioned at all.

15          So it's clear from Babcock that "Henderson told me,"

16  and, again, only after the suppression, do we have an alternate

17  theory of what may have happened.

18          I don't know anywhere under the Collective Knowledge

19  Doctrine that we can all piece it together later.  In other

20  words, it has to be -- the officer has to have the information

21  at the time of the stop.  We can't just construct it later and

22  say, where do we get all of this information, and then put it

23  together when we're arguing a suppression motion.

24          So really the way I look at it, the Court really has

25  two choices.  It can rely on the exhibits that are attached to

1    the motions as to what happened at the time this went down; as

2    the officers recorded it, they record, "This is what I

3    observed, this is what happened."  Officer Babcock said, "I

4    could have written a supplemental report and changed it."

5    Detective Henderson could have changed it.  Or, is the Court

6    going to rely on a different version that comes to light only

7    after it's been challenged by Mr. Seay?

8           So I think the evidence is clear that the officer

9    providing the information did not have probable cause -- did

10   not have personal knowledge and, therefore, no probable cause,

11   for the Collective Knowledge Doctrine to apply.

12          Let me just make a brief comment on the third prong.

13   The stop must be no more intrusive than would have been

14   permissible for the officer requesting it.  And the government

15   argues in their brief that the stop was far entirely ordinary,

16   and I guess I take exception -- not to the government's brief,

17   but to the concept of someone rolling a stop sign that requires

18   five police officers and a K-9.  I think that's not an ordinary

19   traffic infraction.  I think it is more intrusive than what

20   would have been permitted had just a single patrol officer seen

21   an infraction.

22          It's so unusual that Mr. Seay is pulled out of the car

23   about 5:05 or so and he is literally in the Michigan City

24   Police Department within about eight minutes.  I understand the

25   geography as well.  I mean, it's not necessarily an unfair

1    argument.  They are close to the police station.  But, I mean,

2    he's literally scooped up at 5:05 and he hits the door at 5:12,

3    on what starts as a guy rolling through a stop sign.

4         So we don't believe the Collective Knowledge

5    Doctrine --

6         THE COURT:  Of course, there's more to it than that,

7    right?

8         MR. JONES:  There is.

9         THE COURT:  Because of the hand-to-hand buy and these

10   are trained narcotics officers and they suspect that Mr. Seay

11   was engaged in the sale of drugs and, in fact, was found in

12   possession of marijuana.

13        MR. JONES:  Correct.

14        So this is a pretextual stop.  I mean, there's no

15   question about that.  There's no question that they're waiting

16   for -- they've already got the patrol officer lined up, and he

17   hasn't even committed an infraction yet.  But as drivers in

18   Indiana know, we can't even pull out of a parking lot without

19   committing some infraction.  I mean, I wasn't there.  They say

20   he rolled the stop sign.  If you think about it, he's in a high

21   drug area.  His vehicle has a Mason jar full of marijuana and

22   the video showed a firearm with a high-capacity magazine.

23   We've got a driver now driving -- well, one officer said

24   disregarded multiple stop signs, which doesn't make a whole lot

25   of sense to me if you had those items on your person.  I think

1    you might be driving a little more carefully than just be

2    rolling stop signs in that area.  But, be that as it may, they

3    already knew they were going to stop Mr. Seay for something,

4    and Officer Babcock is the innocent party in here.  He says

5    "Officer Henderson told me to stop this car because it ran a

6    stop sign," but that's not what happened, because Henderson

7    doesn't have any personal knowledge and said himself he didn't

8    see it.

9         So that's what we're left with.

10        THE COURT:  Of course, Officer Babcock testified today

11   that he was in error in that respect and, in retrospect, it

12   wasn't Detective Henderson who told him those things.

13        MR. JONES:  He did.  He said he was confused.  But

14   that begs the question of:  What are we entitled to rely on?  I

15   mean, how do we conduct our business?  How do we protect

16   defendants under the Fourth Amendment if the officers later

17   just say, you know what, I was confused; it's not green, it's

18   red; it's not red, it's green.  It's a wholesale change of the

19   facts.  That's not -- he did say those, it's under oath and

20   it's been transcribed, but that's not what he said in his

21   report to begin this investigation.  That's not what he said,

22   so we're here today to challenge that.

23        THE COURT:  Okay.  Thank you, Mr. Jones.

24        Ms. Donnelly.

25        MS. DONNELLY:  Thank you, Your Honor.

1    I'm going to try not to retread too much of what's

2    already in our response.

3    But the defense argument from the government's

4    perspective is based much on speculation, not on the evidence

5    that we heard today.  Part of the reason that we have hearings

6    is to get a full account of what happened.  Reports are

7    ultimately only summaries.

8    Here, we believe there was probable cause for the

9    traffic stop based on two grounds:  the drug trafficking

10   investigation and then the traffic violations.

11   As to the traffic violations, I think that this comes

12   down to something actually extremely simple, Your Honor, and

13   that's two things:  One, the uncontroverted testimony today is

14   that Detective Shiparski observed two traffic violations.  And

15   what is the first thing that Officer Babcock says on his body

16   camera?  "I stopped you for rolling a couple stop signs back

17   there on Elm."

18   So it's disingenuous to say that Babcock had no idea

19   what it was that was going on when we have video that shows him

20   saying exactly the reason behind the stop.  Moreover, we do

21   have that here, but according to -- and I apologize on the

22   pronunciation here -- *Nafzger*, which is cited in the

23   government's brief, the officer making the stop doesn't even

24   need to know the underlying reason for the suspicion, just that

25   there is a suspicion.

1          Here, there was the traffic violations.  There was a

2    hand-to-hand transaction in a high narcotics trafficking area.

3    The car is pulled over.  Officer Babcock learns almost

4    immediately that the only occupant of the car is driving

5    without a valid license, and within the approximately two

6    minutes that he's checking his license and registration, there

7    is a positive alert on the car which gives probable cause to

8    search the entire vehicle.

9          The government believes this is fairly

10   straightforward.  We have four people today who testified to

11   the same situation, that the phone call, conference call,

12   encrypted police radio was a bit chaotic with information being

13   overheard and coming from different circumstances, different

14   people.  But, again, Officer Babcock's video has him saying

15   first thing to Mr. Seay:  "I stopped you for rolling a couple

16   stop signs back there on Elm."

17          So we would ask that the motion be denied.

18          THE COURT:  Thank you, Ms. Donnelly.

19          I guess, Mr. Jones, I just want to ask you a quick

20   question.  I don't even know if this is necessarily applicable

21   to these facts or facts the Court might find.

22          Let's say, hypothetically, that Officer Babcock was

23   notified by Detective Henderson.  Would there be anything wrong

24   with that based on the Collective Knowledge Doctrine, so long

25   as Detective Henderson gained that information from another

1    member of the Michigan City Police Department?  So, for

2    instance, hypothetically, Detective Henderson is on a call with

3    Fish and Shiparski where he hears them say that the defendant

4    rolled through two stop signs, and then Detective Henderson

5    communicates to Babcock to make the stop.

6         Under the Collective Knowledge Doctrine, would that be

7    inappropriate?  It would seem if you look at cases like *Nafzger*

8    and *Valencia* and a couple others that that wouldn't be

9    problematic.

10        MR. JONES:  I just don't how many steps removed we can

11   get.  I didn't mean to imply with the government -- I think

12   Babcock knew exactly why he was stopping the vehicle.  I don't

13   think it was a mystery to him.  I just think the information

14   that he got was not from somebody that observed the violation.

15   And the Court's point is, how many steps back can we go?  I

16   don't know the answer to that because the officer is not

17   relying on -- at least what he says, he's not relying on

18   multiple sources; he's relying on one source.  And it occurred

19   to me that this source doesn't -- this source right here didn't

20   personally observe anything.  That's the gist of our argument.

21        THE COURT:  Do you think the case law requires that,

22   that Detective Henderson personally --

23        MR. JONES:  I don't think it's clear.  So I'm trying

24   to impute Rule 601 into the mix here.  I think it's a slippery

25   slope, once we start with "he said that he said yesterday that

1    he saw him."  I don't know where that ends.  I don't think the

2    case law is very clear as to whether the officer providing the

3    information -- that's what the case says -- has to be the one

4    with personal knowledge of the offense.  It seems to imply that

5    to me; otherwise, why isn't somebody else doing it?

6              THE COURT:  Okay.  Thank you, Mr. Jones.

7              As well -- as always, I should say, the parties in

8    this case were very well-represented by counsel, both in terms

9    of your briefing and your performance here in court today, and

10   I respect that and appreciate that as always.  Thank you for

11   your preparedness.

12             The Court takes the matter under advisement and will

13   be issuing an order in hopefully the very near future, and

14   we'll go from there.  Okay.

15             Counsel, thank you.  Mr. Seay is remanded to the

16   custody of the Marshals Service.  We are adjourned.  You all be

17   safe.

18             (Proceedings adjourned at 12:41 p.m.)

19

                        *CERTIFICATION*

20

21        I, JOANNE M. HOFFMAN, Federal Certified Realtime
     Reporter, certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.

22

                    *Joanne M Hoffman*

     _____        August 27, 2020

24                   Certified Realtime Reporter
                     United States District Court

25                   Northern District of Indiana
                     South Bend Division

Joanne M. Hoffman, Federal Certified Realtime Reporter
Joanne_Hoffman@innd.uscourts.gov
(574)246-8038