UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.   ) | Case No. 3:20-CR-006 JD |
| ) | |
| RAPHEAL SEAY ) | |

## **AMENDED OPINION AND ORDER[1]**

Defendant Raphael Seay is charged with one count of possessing a firearm as a felon. Mr. Seay was stopped by an officer after committing two traffic violations and he did not have a driver's license but provided his identification card and the vehicle's registration. [DE 17]. While the first officer was running a background check on Mr. Seay's documents in his squad car, a second officer's K-9 partner gave a positive alert to the existence of drugs at the driver's side door of Mr. Seay's car. A search of his person revealed marijuana and other drug paraphernalia. A search of the car revealed a firearm with a high capacity extended magazine under the front passenger seat and another magazine in the center console. [DE 19]. Mr. Seay has now moved to suppress all evidence obtained during the search of his person and his vehicle, arguing that the searches were unlawful. For the following reasons, the Court denies the motion to suppress.

## **I.  FACTUAL BACKGROUND**

On December 9, 2019, members of the La Porte County Drug Task Force were conducting surveillance of Mr. Seay, who the officers knew from an ongoing investigation into the sale and distribution of narcotics. [DE 26 at 8-9]. The surveillance was conducted by Investigator Shiparski and Detective Fish a few blocks from the Michigan City Police Department ("MCPD"). At approximately 4:30 p.m., Investigator Shiparski and Detective Fish

---

[1] The Court has amended this order to reflect the citations to the transcript of the evidentiary hearing that was docketed at DE 26.

observed a "dark colored Nissan Altima, with tinted windows" park near the area of Elm and Main Street. [DE 17-1 at 1]. Investigator Shiparski, "familiar with [Mr. Seay's] appearance and characteristics through previous law enforcement investigations," recognized Mr. Seay as he exited the vehicle and walked up to the porch of a nearby home. *Id*. Around 4:45 p.m., Investigator Shiparski observed another sedan pull up to where Mr. Seay was standing, Mr. Seay approached the vehicle, and conducted "what appeared to [be] . . . a hand-to-hand transaction." *Id*. Investigator Shiparski watched Mr. Seay approach the vehicle, interact briefly with the driver who remained in the vehicle before walking away and then the vehicle pulled away. *Id*.

At around 5:00 p.m., Investigator Shiparski and Detective Fish watched Mr. Seay get into his car, pull away from the house, and drive south on Elm Street. At this point in time, Investigator Shiparski observed that the car that Mr. Seay was driving "failed to come to a complete stop" at the intersections of Elm and Pearl Street and then at Elm and Dupage street. *Id*. While Shiparski and Fish were conducting surveillance of Mr. Seay, they were communicating with Detective Henderson, who was located at MCPD, and Officers Babcock and Oberle, who were parked in the MCPD parking lot a couple blocks away. [DE 26 at 11-12, 36-37]. At the evidentiary hearing, Detective Shiparski testified that "[f]rom the moment we began surveillance, I was in constant communication with Corporal Henderson via the radio." [DE 26 at 15]. Detective Shiparski explained that they were simultaneously in contact with Detective Henderson by way of the police radio and with Officers Babcock and Oberle via a cellphone through the Bluetooth in-car phone system. [DE 26 11-12]. While listening to the information relayed from the surveillance team, Officer Babcock drove to where the vehicle was traveling and then activated his red and blue lights and initiated a traffic stop. [DE 26 37-38].

2

After identifying himself to Mr. Seay, Officer Babcock explained that he stopped Mr. Seay "for rolling a couple stop signs on Elm." *Id*. at 40. Mr. Seay stated that he did not have a driver's license but provided his Indiana ID card and the registration for the vehicle. While these events were occurring, both Detective Henderson and Officer Oberle arrived at the traffic stop to assist with the investigation. As Officer Babcock completed a background check on Mr. Seay's information, Officer Oberle walked around Mr. Seay's vehicle with his K9 partner, Axel. *Id*. at 41. When Officer Oberle commanded Axel to sniff, "he walked around the driver's side of the vehicle where I observed a change of behavior in the form of him stopping at the driver's door seam and his breathing becoming louder and faster." [DE 17-4 at 1]. Officer Oberle explained in the evidentiary hearing that Axel made a "passive alert" for drugs by sitting next to the driver's side door. [DE 26 at 74].

Once Officer Oberle alerted the team to the passive alert, Officer Babcock returned to Mr. Seay's vehicle and asked him to step out. [DE 26 at 41-42]. As Detective Henderson was patting down Mr. Seay, he "immediately felt a large mason jar in [his] front right coat pocket and [said] the following, 'You probably have a jar of weed in your pocket,' and Mr. Seay stated yes." [DE 17-2 at 1]. Following this, Mr. Seay was detained and Detective Henderson completed a search of his person where he found: a digital scale, small clear plastic zip lock bags, a clear plastic bag containing a green leafy substance, a dropper bottle containing Crazy Glue, an iPhone and $33 of U.S. currency. *Id*. at 1-2. Officer Oberle started searching the passenger compartment of the vehicle and Detective Henderson informed Mr. Seay that the positive K9 alert provided probable cause to search the vehicle. *Id*. at 2. Officer Oberle alerted all officers on the scene that he found a handgun underneath the front passenger seat. *Id*. Officer Babcock then transported Mr. Seay to the MCPD to begin the booking process. Officer Oberle located an additional loaded

magazine in the center console of the Nissan. *Id*. Detective Henderson noted in his report that he "took possession of all articles of evidence found inside the Nissan at approximately 1730 hours." *Id*.

Once all the evidence from Mr. Seay's person and vehicle were processed and stored, Investigator Shiparski and Detective Henderson spoke with Mr. Seay in the holding area at MCPD. Mr. Seay was escorted to an interview room where he waived his Constitutional rights and confessed to possessing approximately 14 grams of marijuana and a 9mm pistol with a 30-round clip. [DE 17-1 at 2]. Mr. Seay stated that he "purchased the firearm off the streets in South Bend for $450" about a month prior, that he was the only person to possess it, and that he had never shot it. *Id*. Mr. Seay "stated that he knew he was a felon and that he couldn't possess a firearm, but that he felt he needed one to protect himself." *Id*. Mr. Seay also explained that he used his cell phone to arrange the sale of marijuana and that he does not sell any other kind of drug. *Id*. Finally, Mr. Seay was issued three traffic tickets with a time stamp of 07:14 pm—one for driving while suspended and two for failing to make a complete stop at two intersections. [DE 17 at 7].

## II.  DISCUSSION

Mr. Seay now moves to suppress all of the evidence obtained during the search of his person and his vehicle as the evidence is the direct fruit of an illegal, warrantless seizure conducted by police officers and upon which the Grand Jury solely relied in its indictment of him for being a felon in possession of a firearm. Mr. Seay also stated at the evidentiary hearing that he did not question the events subsequent to the stop made by Officer Babcock but stated that his argument came down to whether Officer Babcock had probable cause to make the stop in the first place. [DE 26 at 4-5].

   A.     **Probable Cause for the Stop**

Mr. Seay argues that the search of his person and the car was unlawful, and as the result of that search, the evidence found should be suppressed. The government indicates that only the 9mm pistol, its ammunition, the second magazine and its ammunition, Mr. Seay's cell phone along with some of its extracted contents, and portions of his recorded interview with investigators would be admissible at trial. [DE 19 at 6]. The parties dispute a number of issues relative to the stop and subsequent search, but primarily disagree as to whether there was probable cause for the stop.

Mr. Seay argues that Officer Babcock lacked probable cause to seize him and the vehicle he was operating. Both parties agree that Officer Babcock did not personally witness or observe Mr. Seay commit the two alleged traffic infractions which led to the traffic stop and issued citations. To complicate matters, Officer Babcock's report indicates that "Detective Henderson relayed more information stating that he witnessed the vehicle commit multiple traffic infractions" which led Babcock to make the traffic stop. [DE 17-3 at 1]. Officer Oberle's report indicates that he was contacted by Detective Henderson as well. [DE 17-4 at 1]. Detective Henderson's report does not state that he communicated this information to either officer. [DE 17-2 at 1]. And notably, Investigator Shiparski's report indicates that he was the one to contact Officer Babcock regarding Mr. Seay's traffic violations. [DE 17-1 at 1]. Thus, Mr. Seay argues that Officer Babcock lacked probable cause to seize him and the vehicle he was operating because 1) he did not personally witness the traffic offense and 2) his knowledge cannot be imputed through the "collective knowledge doctrine." [DE 17 at 13].

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). In this instance, Investigator Shiparski and Detective Fish observed Mr.

5

Seay's car fail to come to a complete stop at two intersections, but they were not the officers who completed the traffic stop. The collective knowledge doctrine applies to situations such as this where "[t]he police who actually make the arrest need not personally know all the facts that constitute probable cause if they reasonably are acting at the direction of another officer or police agency" and instead "the arrest is proper so long as the knowledge of the officer directing the arrest, or the collective knowledge of the agency he works for, is sufficient to constitute probable cause." *Tangwall v. Stuckey,* 135 F.3d 510, 517 (7th Cir. 1998) (emphasis removed). Thus, under the doctrine, Officer Babcock could stop, search, or arrest Mr. Seay at the direction of another officer even if he did not have firsthand knowledge of the facts that provided the necessary level of suspicion for the stop. *See United States v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010). There are three requirements for the doctrine to apply:

> "(1) the officer taking the action must act in objective reliance on the information received, (2) the officer providing the information—or the agency for which he works—must have facts supporting the level of suspicion required, and (3) the stop must be no more intrusive than would have been permissible for the officer requesting it."

*United States v. Nafzger,* 974 F.2d 906, 911 (7th Cir. 1992). Generally, if the officers conducting surveillance and the officers making the traffic stop are in close communication with each other, then the collective knowledge doctrine will apply. *See United States v. Parra*, 402 F.3d 752, 766 (7th Cir. 2005); *Williams*, 627 F.3d at 256. "Thus, it is the ability of the officers to communicate with each other that matters most, not whether the officers were physically at the same scene." *Nafzger,* 974 F.2d at 911.

To apply the collective knowledge doctrine here, the Court must determine what knowledge may be imputed to Officer Babcock at the time of the traffic stop and whether that knowledge was sufficient to support probable cause for the stop. When Mr. Seay was stopped on

Thurman Street, the team of officers involved in his surveillance and the traffic stop had the following information: (1) Mr. Seay was in an area known for its drug activity, (2) Mr. Seay had a history of dealing drugs, (3) Mr. Seay came and went from a house under surveillance over the course of 45 minutes to an hour, (4) Mr. Seay likely completed a hand-to-hand drug transaction outside of the house, and (4) after leaving the house, Mr. Seay failed to make a complete stop at two stop signs as required by law. [DE 26 at 9-11; 15-16]. This is sufficient evidence in aggregate to establish probable cause for Mr. Seay's stop. Now, the Court must determine whether this information may be imputed to Officer Babcock who stopped him.

Although it is not clear from the different individual police reports what information was conveyed by whom, the record from the evidentiary hearing demonstrates that the officers conducting surveillance of Mr. Seay were in close communication with Detective Henderson and the two patrol officers including Officer Babcock. Investigator Shiparski testified that while conducting surveillance of Mr. Seay, he was communicating by radio with Detective Henderson and "[a]t the same time, I had Officers Oberle and Babcock on the phone, again, on that speaker Bluetooth system within our vehicle. So as that's happening and as I'm communicating with [Detective] Henderson via radio, Babcock and Oberle can also hear what I'm saying to [Detective] Henderson." [DE 26 at 16]. Investigator Shiparski stated that he informed everyone that Mr. Seay had disregarded two stop signs and that he requested "the vehicle have a traffic stop done . . . by Officer Babcock and/or Oberle." *Id*. Similarly, Officer Babcock testified that the officers involved in the surveillance of Mr. Seay stated they observed multiple hand-to-hand transactions, that they suspected drug dealing was occurring at the house, and that multiple traffic violations had occurred. [DE 26 at 37]. Officer Babcock also testified that through his phone he could hear Officer Oberle, Detective Shiparski, and Detective Fish and that he could

7

hear the detectives communicating with Detective Henderson through their encrypted police radio. *Id*.

The testimony clearly demonstrates that the officers were part of a coordinated investigation and were in close communication with each other. The Seventh Circuit has found officers to be in "close communication" in other similar factual situations. Where numerous cellphone calls between officers were made throughout the transaction reporting the activities and locations of the parties in interest and while other officers communicated with the surveillance team by radio, *see Parra*, 402 F.3d at 765; where a confidential informant shared information about narcotics potentially being stored in a vehicle with one officer who then called other officers who were the ones that ultimately completed the traffic stop, *see United States v. Harris*, 585 F.3d 394, 401-402 (7th Cir. 2009); and where a detective advised officers of an investigation into drug trafficking and requested they stop the suspect's car approximately 20 minutes after observing a drug transaction, see *United States v. Nicksion*, 628 F.3d 368, 376 (7th Cir. 2010). The instances where the Seventh Circuit did not find close communication involved situations where there was *no communication* between the officers with knowledge supporting reasonable suspicion and the officers at the scene. *See United States v. Ellis,* 499 F.3d 686, 690 (7th Cir. 2007); *United States v. Wilbourn*, 799 F.3d 900, 909 (7th Cir. 2015) (emphasis added). Notably here, the officers' communication with each other easily qualifies as "close communication" as there were multiple forms of communication occurring almost simultaneously between Officer Babcock and the surveillance team who observed the traffic violations; therefore, the collective knowledge doctrine applies to Mr. Seay's stop.

Moreover, Officer Babcock who completed the traffic stop acted in objective reliance on the information received from Investigator Shiparski and Detective Henderson. Investigator

Shiparski provided the necessary facts to support probable cause to stop Mr. Seay's vehicle for committing traffic violations by failing to come to a complete stop at two stop signs.[2] Even though Officer Babcock did not personally witness Mr. Seay run through the two stop signs, the collective knowledge doctrine enables him to rely on that information from Detective Shiparski. Detective Shiparski testified that Mr. Seay's "vehicle would slow down, however, it [did] not come to a complete stop where the stop sign was erected and proceeded through the intersection." [DE 22 at 29]. "Probable cause exists when 'the circumstances confronting a police officer support the reasonable belief that a driver has committed even a minor traffic offense.'" *United States v. Simon*, 937 F.3d 820, 828–29 (7th Cir. 2019) (quoting *United States v. Cashman*, 216 F.3d 582, 586 (7th Cir. 2000)). If an officer reasonably thinks he sees a driver commit a traffic infraction, that is a sufficient basis to pull him over without violating the Constitution. *United States v. Muriel*, 418 F.3d 720, 724 (7th Cir. 2005).

Here, Mr. Seay was witnessed committing two traffic violations following surveillance of his activities likely involving drug transactions, which formed the basis for Detective Shiparski's direction to stop his vehicle. Under the totality of the circumstances and following communication from Detective Shiparski, probable caused existed for Officer Babcock to stop Mr. Seay due to his traffic violations. *United States v. Sawyer*, 224 F.3d 675, 679 (7th Cir. 2000).

**B.    Search of his Person and Vehicle**

As for the intrusiveness of the stop, the Court finds that it was no more intrusive than necessary. After initiating the traffic stop, Officer Babcock testified that Mr. Seay told him he

---

[2] A person who drives a vehicle shall stop at an intersection where a stop sign is erected at one (1) or more entrances to a through highway that are not a part of the through highway and proceed cautiously, yielding to vehicles that are not required to stop. Ind. Code Ann. § 9-21-8-32.

did not have a driver's license, but instead provided his Indiana ID card along with the vehicle's registration. [DE 26 at 40]. As Officer Babcock is checking the BMV records for Mr. Seay's license plate and driving history, Officer Oberle takes his K-9 partner, Axel, around Mr. Seay's vehicle. *Id*. at 41. Officer Oberle testified that there was a positive alert for narcotics from Axel at the driver's side door of Mr. Seay's vehicle. *Id*. at 79. "It is well-established a dog sniff of a vehicle's exterior only for illegal drugs *during* a lawful stop for a traffic violation does not infringe Fourth Amendment rights, even absent reasonable suspicion of drugs." *Illinois v. Caballes*, 543 U.S. 405, 410 (2005). As in *Caballes*, the dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation. *Id*. at 209. Following the alert from the drug dog, Officer Babcock returned to Mr. Seay's vehicle and asked him to step out of the car before Detective Henderson completed a pat down of his person. And once the drug dog alerted to the presence of drugs, the officer had probable cause to search the car. *United States v. Martin*, 422 F.3d 597, 602 (7th Cir. 2005).

      Mr. Seay was not asked to step out of his vehicle until after a positive alert from a trained drug dog that occurred shortly after the stop was made. And here, the dog sniff did not prolong the stop in any way but was completed simultaneously to a background check being run on Mr. Seay's documentation. See *United States v. Lewis*, 920 F.3d 483, 491 (7th Cir. 2019). After exiting the vehicle at Officer Babcock's direction, Detective Henderson conducted a pat-down and discovered a mason jar in Mr. Seay's jacket pocket, which he confirmed was marijuana. [DE 19 at 4]. Following this discovery, Mr. Seay was detained in handcuffs and Detective Henderson recovered additional drug paraphernalia from his person. *Id*. And based on the K-9 alert, Officer Oberle conducted a search of Mr. Seay's vehicle while he was being detained. Thus, "[a]t each stage of the investigation, the additional information obtained justified additional investigation."

*Martin*, 422 F.3d at 602. Moreover, the video evidence from the officers' body cameras corroborate this testimony demonstrating that the entire stop lasted approximately eight minutes long before Mr. Seay was transported to MCPD. [Ex. 4]. The dog sniff lasted no more than two minutes after Officer Babcock took Mr. Seay's identification and registration back to his squad car. [Ex. 6]. Thus, the stop was no more intrusive than necessary, and Mr. Seay was not detained longer than required to secure the scene and search the car.[3]

Mr. Seay chiefly contested the fact that the officers were all on a conference call together and that Officers Babcock and Oberle were advised of the alleged hand-to-hand drug transaction and the alleged traffic offenses in real time. [DE 20 at 2]. Mr. Seay further asserted that the information supplied by the government in response to the motion to suppress "completely contradict[ed] the background and sequence of events that Officer Babcock and K9 Officer Oberle laid out in their separate reports about the traffic stop" and questioned why the alleged conference call and police radio contact were not referenced in the report. *Id*. The Court finds that the hearing testimony of the police officers was credible, consistent and reasonably explained the inconsistency in the officer's police reports, i.e., discrepancy about which officer had actually witnessed the traffic offense and communicated that information to Officer Babcock.

At the evidentiary hearing, Investigator Shiparski testified that first he and Detective Fish contacted Detective Henderson via radio communication on their encrypted frequency before calling MCPD Officers Babcock and Oberle via cellphone since the officers did not have access to the police radio. [DE 26 at 11-12]. He went on to explain that he had Officers Oberle and

---

[3] The Court also notes that Mr. Seay did not have a driver's license, meaning it would have been unlawful for him to drive away by himself even after the initial traffic stop. *See United States v. Fadiga*, 858 F.3d 1061, 1063 (7th Cir. 2017) (holding that a traffic stop was not unreasonably prolonged where the occupants could not lawfully drive away in the car).

11

Babcock on the phone through the car's Bluetooth speaker system while simultaneously communicating with Detective Henderson via police radio. *Id.* at 16. Shiparski further testified that he "informed everybody that the vehicle and driver had disregarded those two stop signs . . . [and] request[ed] that the vehicle have a traffic stop done on that vehicle by Officer Babcock and/or Oberle." *Id.* Officer Babcock corroborated this testimony and explained the discrepancy in his police report, which stated that Detective Henderson directed him to make the stop instead of Investigator Shiparski. At the hearing, Babcock testified that at the time, he believed it was Detective Henderson who directed him to make the stop as they "were all speaking on this conference call and it was a radio communication, so I was just confused as to who had actually viewed it because they're all talking on the same line." [DE 26 at 38]. Moreover, Officer Oberle testified that he was first contacted by Henderson to be in the area of the police department due to the drug surveillance occurring and then stated that he was later contacted by Shiparski and Fish via a conference call where he "could hear everybody in the background." *Id.* at 75.

Due to the number of officers involved and the different methods of communication utilized, it is understandable that Officers Babcock and Oberle were confused as to who communicated the information to them. The Court recognizes that their police reports do not describe *how* the information was communicated to them, but it does not believe that is a critical point, rather the focus should be on *what* was communicated to them. Here, the information supporting the probable cause needed to stop Mr. Seay's vehicle was communicated to the officers who made the stop. Furthermore, the testimony provided at the evidentiary hearing was credible and clearly demonstrated how the series of events unfolded and how the officers, including those with knowledge to support probable cause for the stop, were all in close

12

communication with each other. Therefore, the Court denies Mr. Seay's motion to suppress as to the search of his person and the car.

### III.  CONCLUSION

For these reasons, the Court DENIES the motion to suppress. [DE 17].

SO ORDERED.

ENTERED:  September 2, 2020

/s/ JON E. DEGUILIO
Chief Judge
United States District Court